Newman Erb, Receiver, v. Frank G. Eggleston.

Filed September 19, 1894.    No. 5221.

1. **Negligence:** Railroad Companies: Personal Injuries. Negligence on the part of a railroad company cannot be inferred merely from the fact that the act complained of was unnecessary, nor from the fact that a necessary act was performed in an unnecessary manner. In order to justify the inference of negligence the commission of the act in the manner in which it was committed must, under all the circumstances, have implied a failure to exercise that degree of care which a prudent person would exercise under similar circumstances.

2. ——: Evidence. The evidence in this case examined, and *held* insufficient to establish negligence on the part of the defendant.

Error from the district court of Gage county. Tried below before Appelget, J.

*M. Summerfield* and *Griggs, Rinaker & Bibb,* for plaintiff in error.

*Alfred Hazlett* and *W. C. Le Hane, contra.*

Irvine, C.

Eggleston, a brakeman employed on the Kansas City, Wyandotte & Northwestern railroad, brought this action against the plaintiff in error, a receiver operating said road, for personal injuries by Eggleston sustained while engaged in his work. There was a verdict and judgment in favor of Eggleston for $16,000, which the receiver by these proceedings seeks to reverse. The only assignment which we shall consider is that the evidence was insufficient to support the verdict.

There is no conflict in the evidence, so far as it relates to the principal facts surrounding the accident, and there is no great conflict in regard to the details. Eggleston had

been employed by the receiver as a brakeman for about
three weeks.   He had had about two years' experience on
other roads in the same line of duty.   A freight train,
designated as "No. 104," left Beatrice at 6:40 P. M. for
Kansas City.   The crew of this train consisted of a con-
ductor, engineer, fireman, and two brakemen, Eggleston
being the "rear brakeman," by which we understand the
brakeman posted at or near the rear of the train.   The
Wyandotte road was operated from Virginia to Beatrice
on the tracks of the Chicago, Rock Island & Pacific, but
it had in Beatrice certain side tracks of its own con-
nected by switches with the Rock Island tracks.   On the
afternoon of October 8, 1890, the engineer, fireman, and
two brakemen were engaged in making up train 104,
some time prior to the hour of its departure.   When the
operation begun, the conductor was not present.   There
is evidence tending to show that he arrived on the scene
immediately before the accident, but he took no part in the
operations of the crew and gave no orders.   In making
up this train it was customary, after moving the engine
from the roundhouse, to pull out from a side track the ca-
boose which was to go with the train, throw the caboose
back along another track, and then proceed to pick up the
other cars and move them back and attach them to the ca-
boose.   On the day in question caboose No. 408, which was
to go with the train, stood upon the storage track behind
another caboose, No. 409; both cabooses were, therefore,
hauled from the storage track upon the main line.   Caboose
408 was then shoved back along the main line beyond the
switch.   It next became necessary to replace caboose 409
on the storage track.   It is shown to be a common proceed-
ing in order to accomplish such a movement to "kick" the
car back upon the siding.   This operation of "kicking" is
described in the evidence as follows: The car to be kicked
standing between the engine and the switch, the switch is
thrown to the proper position, the car uncoupled from the

engine and the engine started, shoving the uncoupled car as it moves. When sufficient momentum has been given the car to move it to the desired point, the movement of the engine is stopped and the car allowed to move on, some one riding upon the car for the purpose of applying the brakes at the proper place for stopping. By this process caboose 408 had been kicked back upon the main line, Eggleston riding upon it and applying the brakes. Having brought caboose 408 to a stop, Eggleston alighted and, proceeding towards where the engine and caboose 409 then were, he gave the signal to the other brakeman to pull the pin which connected caboose 409 with the engine. This signal is described in the testimony as a signal to kick and also as a signal indicating that Eggleston was ready to leap upon caboose 409 for the purpose of stopping it. The pin was accordingly pulled, the caboose thus disconnected with the engine, and the kicking process begun. As the car and engine approached Eggleston he gave a signal to "stop kicking." He testifies that the engine was at that time one hundred feet east of him and was moving at the rate of twelve to fifteen miles per hour. As the caboose passed him he seized the hand-holds and endeavored to mount. According to his testimony the speed of the engine had then been checked to such an extent that there was a space of from eight to ten feet between the caboose and the engine. Eggleston's hands were wrenched loose from the hand-holds and he fell upon the track behind the caboose and in front of the moving engine, which passed over him, mangling both arms so that amputation was necessary, and inflicted other severe injuries. Eggleston, when he gave the signal to stop, was so situated that the side of the locomotive cab nearest him was that occupied by the fireman. The signal to stop was, therefore, received by the fireman and communicated by him to the engineer.

The foregoing are the main facts disclosed by the evidence. These are brought out, however, with great elab-

oration and detail, and there is much testimony relating to
directions, distances, time, and speed.    This evidence has
all been carefully examined, but in the view we take of the
case it will not be necessary in this opinion to refer to it to
any great extent.    It is at first somewhat difficult to per-
ceive wherein the defendant in error claims there was neg-
ligence on the part of the plaintiff in error.    In order to
consider the question upon the theory of the defendant in
error, we shall refer to his petition and then to a summary
from his brief in which he has undertaken to collect and
state the facts which he claims to support his case.    The
petition, after a great deal mostly in the nature of induce-
ment stating the facts not very differently from the manner
in which we have stated them, proceeds as follows :  " The
said defendant did, then and there, so negligently and un-
skillfully control and manage said engine No. 10, and the
brake thereto attached, that said locomotive suddenly and
violently, and without notice or warning to plaintiff, was
kept moving, and came rushing down upon and over this
plaintiff at an unusual and unreasonable rate of speed,
where this plaintiff had fallen as aforesaid, and who had
not the time to throw himself therefrom and out of the
danger in which he was then."    This is the only allegation
of negligence in the petition.    An analysis of this language
leads to these observations :    First, the only negligence
charged lies in the management of the engine and its
brake; secondly, while the language is cast in an affirma-
tive form it amounts to a charge that the negligence con-
sisted in failing to stop the engine and in moving at an
unusual rate of speed.    If the plaintiff was entitled to re-
cover at all it must be upon proof tending to establish these
allegations.    Passing now to the summary in the brief
already referred to, we will examine it with reference to
these allegations of the petition.

The defendant in error says: " First—That the plaintiff
below, Frank G. Eggleston, was a brakeman in the em-

ployment of Newman Erb, receiver, and was injured through the negligence of his servants or employes." It must be observed in passing that this statement, if supported by the evidence, would in itself convey no charge of legal liability as long as the doctrine of fellow-servants retains any place in our jurisprudence. Such a state of affairs, standing alone, would rather imply freedom from liability than the contrary. But what were the facts? There is evidence tending to show that by the immediate application of all the means for bringing the engine to a stop instantly upon the giving of the signal by Eggleston the engine might have been brought to a stop before it reached the point where Eggleston fell upon the track; but some short period was required to render Eggleston's signal effective. From the position he took, this signal could not be seen by the engineer, but was necessarily communicated to the engineer by the fireman. This occupied some time, during which the engine was approaching. In the next place it is fair to presume there was some necessary movement of the engine before it was possible for the engineer to act in response to the signal. Further, the uncontradicted evidence is that the engineer did act promptly. Eggleston does not pretend to know what action was taken, but his testimony that he gave the signal immediately before starting to board the car, and that at the time he boarded it he observed an interval of eight or ten feet between the car and the engine, shows that prompt action was taken. Finally, and this is the important consideration, it appears from the uncontradicted evidence that it is not customary, and for the sake of the machinery it is not desirable, on such occasions to bring the engine to a stop by the shortest means possible. Such means are used only in the case of emergency, and it is not pretended that there was any knowledge on the part of the engine crew of the existence of such an emergency at the time of Eggleston's fall as would imply negligence in not making an emergency

stop at that time or when his fall became known.   On the contrary, it is perfectly clear that at the time he fell upon the track it was too late to prevent his injury.   A railroad company is not responsible for every action taken by it which was not absolutely necessary.   In such cases as this it is liable only because of negligence.   In order to re-cover it was necessary for the plaintiff to show, not that the movement of the engine was unnecessary, but that it was done under such circumstances as to imply a failure to exercise that care which a prudent man would exercise under similar circumstances.   (*Omaha & R. V. R. Co. v. Brady*, 39 Neb., 27; *Omaha & R. V. R. Co. v. Clarke*, 39 Neb., 65.)   So here, while the evidence is sufficient to ground an inference that there was a physical possibility of stopping the engine before it reached the spot where Eggleston fell, still we find nowhere any evidence to show that any danger was to be apprehended in failing to do so or that the action of the engineer was not that to be expected of a prudent man under like circumstances.   It might be claimed in this connection that this operation of kicking a car is in itself unnecessarily hazardous, and is evidence of negli-gence.   To this it may be answered, in the first place, that the petition charges nothing of the kind, and, in the sec-ond place, that since all the evidence, including E.gle-ston's, is to the effect that the maneuver was made solely in response to signals given by Eggleston himself for that purpose, therefore, if the movement of the train in that manner was in itself negligence, it was the negligence of Eggleston and not that of other employes.

The brief then proceeds: "Second—That Eggleston was working under the direction and authority of Tom Irwin, the conductor of 104, who had the right to command the movements of said freight train, and to control Eggleston and the other servants employed upon it.   Third—That under the evidence and our law, Tom Irwin, the conductor, being in control and having the management of this train,

was a vice-principal to the engineer and other employes of said train." The evidence does show that Irwin was the conductor, but it also shows that this train was not being made up under his supervision. The only evidence placing Irwin in the neighborhood before the accident happened is that of Eggleston, who first says that he does not remember whether he saw him until after he was hurt, and afterwards states that Irwin boarded one end of caboose 408 as he, Eggleston, left the other end. No one pretends that Irwin was exercising any supervision over the proceedings of the other employes. From instructions given by the court it would seem that the plaintiff's precise theory upon this branch of the case was that in the absence of the conductor his duties were delegated to the engineer, and that the latter, therefore, occupied with relation to Eggleston the position of a vice-principal; but there is not one word in the record tending to show any such delegation of authority. On the contrary, the only evidence as to the relations of the different members of the crew is that of Eggleston, who says that the engineer and fireman had nothing to do with employing him or paying him, had no power to discharge him, had no power to direct him in the performance of his work, and that they never did so. His testimony shows that he, the fireman, the engineer, and the other brakeman, in making up the train, were acting in association, none as superior to any other, and that they were fellow-servants within any of the definitions of the term.

"Fourth—That the accident was not caused by the carelessness or any negligence on the part of Eggleston." This must be assumed to be true subject to the hypothesis above presented. The defect in Eggleston's case is that he failed to prove negligence on the part of the plaintiff in error. Therefore, contributory negligence is immaterial. This is true unless, as before noticed, the manner of moving the cars was in itself negligence, and in that case the move-

ment being directed by the plaintiff there was contributory negligence.

"Fifth—That Newman Erb, the receiver, did not exercise due and reasonable care in the selection of careful, responsible, and trustworthy co-employes, and that the same rule applies to Conductor Irwin." Negligence in the selection of employes is not mentioned in the petition, and should not have been submitted to the jury for that reason. Eggleston was undoubtedly very severely injured, and his condition appeals to our sympathy as it evidently appealed to that of the jury, but, so far as this record discloses, his injuries were not due to any negligence on the part of the receiver or his servants. The judgment must, therefore, be reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.