ADOLPH GOLDSMITH ET AL., APPELLEES, V. C. L. ERICK-
SON, IMPLEADED WITH CHARLES E. FORD ET AL.,
APPELLANTS.

FILED APRIL 10, 1896. No. 6280.

1. **Fraudulent Conveyances: EVIDENCE: CREDITORS' BILL.** Where a
purchase of an entire stock of goods, books of account, and fix-
tures of a merchant was made at a fair price, and with no knowl-
edge that such merchant was at the time indebted to other parties,
it should not be declared void though the purpose of the purchaser
was in part to secure payment of a debt due the bank of which he
was at the time cashier.

2. ———: ———. The case of *Bonns v. Carter,* 20 Neb., 566, having
been overruled, there was, in this state, no presumption of law
that a transaction was fraudulent merely because the property
was in effect all that the vendor owned.

3. ———: ———: QUESTION OF FACT. Whether or not a transfer of
property is fraudulent as against the creditors of the vendor is a
question of fact determinable solely upon the evidence adduced
in each case.

APPEAL from the district court of Douglas county.
Tried below before IRVINE and WALTON, JJ.

*James H. Macomber* and *Wharton & Baird,* for Charles E.
Ford and Union National Bank, appellants.

*Cavanagh, Thomas & McGilton, Edgar H. Scott, Bartlett,
Baldrige & De Bord, N. H. Tunnicliff, J. W. Roudebush,
L. F. Crofoot, Frank Heller, J. W. West, L. D. Holmes, A. C.
Wakeley, Montgomery, Charlton & Hall,* for other parties.

RYAN, C.

On the 30th day of December, 1891, Adolph Goldsmith,
Weis & Oppenheimer, Wolf & Co., Heyman & Sweet, and
the Middleton Plate Company, as plaintiffs, brought an
action in the district court of Douglas county against
C. L. Erickson, Charles E. Ford, and the Union National
Bank of Omaha. The averments in the petition were, in

substance, that on and prior to December 31, 1890, the defendant C. L. Erickson was indebted to the several plaintiffs in the amount described, and was the owner in possession of a large stock of jewelry, with the fixtures and other property connected therewith, and was carrying on a retail business in the city of Omaha; that said Erickson was indebted to the Union National Bank not to exceed $5,000; that on and prior to December 31, 1890, the various creditors of said Erickson were pressing him for payment, and that suits had been brought by some of the plaintiffs and were then pending. The fraudulent conduct of the defendants was alleged as follows: "On the said 31st day of December, 1890, said Erickson, for the purpose of defrauding, hindering, and delaying his creditors, sold and transferred his said stock to said Charles E. Ford, and that said Charles E. Ford well knew of the intention on the part of said Erickson to hinder and delay his creditors, and that it was agreed between said Charles E. Ford, individually, and as an agent of said defendant, the Union National Bank, that said Erickson should transfer the title to said property to said Ford to hold the same for the Union National Bank, and sell said property and satisfy the indebtedness due said bank from said Erickson, and it was agreed by and between Ford, as such cashier and individually, and said Erickson that said Ford would account to Erickson for the balance over and above the amount sufficient to satisfy said defendant, the Union National Bank; that there was no other or different consideration for such transfer paid by said Ford or the Union National Bank to said Erickson; that said Union National Bank and said Ford well knew of the fraudulent intention on the part of said Erickson and conspired with said Erickson to defraud his said creditors; that on said 31st of December, 1890, said Erickson executed a bill of sale to said Ford for his said property, and that said Ford and said Union National Bank took possession of said property and converted it to their own use; that said property was, as plaintiffs are

8

informed, of the value of twenty-five thousand ($25,000) dollars; that said property so converted by said defendants and belonging to said Erickson was all the property which said Erickson had in his own name and subject to execution, all of which said Ford and said Union National Bank well knew." Following this language there was a description in detail of the judgment or judgments held by each plaintiff against C. L. Erickson, and in respect to each it was alleged that an execution had been issued and returned unsatisfied, and, in general, it was alleged that said Erickson had no property in his own name on which an execution could be levied. The prayer of the petition was as follows: "Wherefore said plaintiff asks that said Union National Bank and said Charles E. Ford be required to account for the goods received by them from said Erickson, and that said plaintiffs have judgment against said Union National Bank and Charles E. Ford for the amounts of their claims against said Erickson." Between the date of the filing of the above petition and the trial there was filed in this case the petitions of fifteen intervenors, to whom, it was stipulated on the trial, there was due the aggregate sum of $4,602.82. These intervenors made allegations and claimed relief of the same nature as had been done in the original petition. The aggregate amount due the original plaintiffs, it was stipulated on the trial, was $2,192.50, so that at the time the decree was rendered, on January 27, 1893, the total amount of indebtedness of C. L. Erickson as to which Charles E. Ford and the Union National Bank were held liable as trustees to the original plaintiffs and the intervenors before the decree was $6,795.32. Subsequent to the entry of this decree there were other petitions of intervention filed, in which, in each case, it seems to have been assumed that there was to be a general distribution of the value of the stock of C. L. Erickson whenever C. E. Ford and the Union National Bank should pay the same. This was not warranted by the original decree, for, after having made pro-

vision for the appointment of a referee to find and report
the value of the goods, etc., transferred to Ford and the
bank, and also "the amount now due the various credit-
ors of Erickson who are parties in this suit," this decree
contained this immediately following language: "And
upon the filing of the report of said referee and his find-
ings in the case the court will make a distribution of the
amount of the value of said stock, fixtures, and book ac-
counts, in the manner provided by law and to the various
creditors in this action entitled to said money." Not-
withstanding this restrictive language, other alleged
creditors of Erickson, as already stated, filed their peti-
tions for the aggregate amount of $4,808.61, after the
entry of the decree above referred to.   Each individual
of this class of intervenors was, by the decree made upon
the coming in of the report of the referee, adjudged enti-
tled to share the amount of the value of the goods, book
accounts, and fixtures *pro rata* with the others, and the
rights of this class were decreed inferior and subject to
those of the original petitioners and those creditors of
Mr. Erickson who had intervened before the first decree
was rendered.   This made the entire amount of the
claims with reference to which the bank and Mr. Ford
were held to sustain the relation of trustees, $11,603.93.
The difference between this amount and the above men-
tioned sum of $6,795.32 represents the aggregate amount
of the claims presented by petitions filed after the first
decree was entered.   There was allowed Ford and the
bank the sum of $2,000 for services rendered and ex-
penses incurred in disposing of the goods, book accounts,
and fixtures which Erickson had turned over to Ford.
From the first decree, and from that part of the last
which enforced their liability as trustees, Ford and the
bank appeal, and from the allowance of $2,000 in favor of
Ford and the bank, and from their postponement as a
class, the creditors of Erickson who filed their petitions
after the entry of the first decree also appeal.

The theory upon which the original plaintiffs and those

who intervened before the first decree drew their petitions is much more intelligible if it is borne in mind that the very commencement of this action was almost exactly a year after the date of the sale made by Mr. Erickson to Charles E. Ford. Meanwhile many of the goods had been sold and it was probably impossible to reach those remaining. These petitions, while somewhat in the nature of creditors' bills, really had for their object the subjection to the debts of plaintiff and the intervenors of the value of the goods, book accounts, and fixtures, rather than those particular articles in kind. From this it resulted that while the good faith of the purchase was attacked, there was no attempt to set it aside. In a certain sense the purchase was approved and it was sought to hold the purchaser liable for the full value of the goods as though no payment had been made thereon. Under these circumstances we do not feel called upon to determine whether or not there were sufficient formalities observed to vest the title in Charles E. Ford. The question to be considered will not, therefore, be whether or not the title passed to Ford, but, it being conceded to have passed, whether or not the purchaser should be held liable for the value of the property as though he had made no payment — those having been made being deemed no payments because made in an alleged attempt to hinder, delay, and defraud the creditors of C. L. Erickson. Thus shorn of extraneous considerations the propositions to be considered are, first, whether the evidence disclosed the existence of the alleged fraud as a matter of fact; and second, whether from the facts proved the law raises a presumption of fraud.

The original petition, as well as those of the intervenors, charged that the fraudulent transaction consisted in a sale, by Erickson to Ford, with intent to hinder and delay the creditors of Erickson, shared by the vendor and vendee, and by an accompanying agreement that when sufficient goods have been sold to satisfy the debt of Erickson due the Union National Bank, the remainder

should be accounted for by Ford to Erickson. There was no attempt to make proof that in the purchase there was any condition requiring Ford or the bank to account for the value of anything whatever. The evidence has been very carefully examined since this case was submitted on oral arguments, and we have been able to discover no proof that Ford, who at the time was cashier of the Union National Bank, had any knowledge, when he purchased of Erickson, that the latter owed anything, except the sum of $4,400 to the aforesaid bank and the sum of $4,633.30 to the wife of C. L. Erickson. The note evidencing the indebtedness of C. L. Erickson to the bank fell due a few days before December 31, 1890, and between the maturity of said note and the date last given, Mr. Ford had tried to have it paid or secured. It had been suggested repeatedly to Mr. Erickson that he should give a chattel mortgage on his stock to secure this debt, but this was as often refused. On the 31st of December, 1890, Mr. Ford visited Mr. Erickson's place of business with the intention of having the matter settled in some way, and was told by Mr. Erickson that if the bank or Mr. Ford wanted the stock, it would be sold to either of them for the amount due the bank and the amount which Erickson owed his wife. Not being able to obtain security, Mr. Ford purchased the stock of goods, books of account, and fixtures on the terms proposed, and having received Mr. Erickson's key to the store, he left a Mr. Nelson in possession. On January 2, 1891, Mr. Ford gave Mrs. Erickson his check for the amount due her. Upon this, she thereupon received the money at one window over the counter of the bank and having carried it to another window, she in exchange for it received a certificate of deposit of the Union National Bank, payable to her own order, in the sum of $4,633.30. This certificate she left at the bank under an arrangement between her husband and Mr. Ford or the attorneys for the bank, by which this certificate was to be so left as an indemnity against any loss by reason of attachments, which, on

January 1, 1890, had been levied upon the stock of goods notwithstanding the sale. These attachments aggregated the sum of $4,641.75, and the suits in which they had been issued were not ended until November 4, 1891, when an arrangement was made between the attaching creditors and Mrs. Erickson by virtue of which their debts were paid by the use of her certificate of deposit, the amount of which thereupon Mr. Ford paid to said attaching creditors. There were other details attending this settlement which need not be described, for our present object is only to show in what manner Mr. Erickson sold his stock of goods and to consider whether or not the sale was *bona fide.* It may not be amiss to suggest that the plaintiffs and the intervenors in this action were probably influenced to delay these proceedings by the pendency of the attachment suits, and that the above described settlement, perhaps, at least in a remote degree, suggested that a favorable time had arrived for the commencement of this action. There was no evidence tending in the least to show that the full sum of $4,400 was not due the bank. Mrs. Erickson testified positively that the sum above named as due her had been by her loaned to her husband to enable him to extend his business, and in contradiction of this there was not a scintilla of evidence. It must therefore be accepted as an established fact that for the goods, fixtures, and book accounts Mr. Ford had actually paid the sum of $9,033.30 of the indebtedness of C. L. Erickson, in consideration of which the property purchased was delivered so as to vest in him the title. It is not deemed necessary to discuss the evidence as to the purchase and the turning over of possession on the night of December 31, 1890, or the execution of a bill of sale the following day, or the manner in which the payment was made of the amount owing by C. L. Erickson to his wife, with reference to whether or not the sale was good as against the aforesaid attaching creditors, for, as we have already stated, these creditors have been paid, and their claims that the purchase was incom-

plete have no bearing upon the issues in this action.    The referee provided for in the first decree reported on April 14, 1893, that the value of the goods, book accounts, and fixtures, when taken possession of by Ford, was $10,700; that at the time of filing of said report Ford still had goods undisposed of to the amount of less in value than $1,000; that the accounts collected and the amounts realized by him from the goods and fixtures were $6,860. Between the value of the goods found to exist on January 1, 1890, $10,700, and the aggregate of the two amounts paid by Ford, $9,033.30, there was but a difference of $1,666.70.    If, therefore, he expended $2,000 for caring for and selling the goods, there was to him a loss rather than a profit in the transaction.    The propriety of the allowance of this $2,000 is questioned by no one, except such parties as came into this case after the first decree as intervenors, and they are in no position to object, for two reasons: First, the decree just spoken of provided for distribution among parties then in the action;  and, second, these intervenors served no notice of the pendency of their petitions of intervention, and in respect to them neither Ford nor the Union National Bank made an appearance.  (*Hapgood v. Ellis*, 11 Neb., 131;  *Cockle Separator Co. v. Clark*, 23 Neb., 702;  *Carlow v. Aultman*, 28 Neb., 672;  *Arnold v. Badger Lumber Co.*, 36 Neb., 841;  *Schultz v. Loomis*, 40 Neb., 152;  *Patrick Land Co. v. Leavenworth*, 42 Neb., 715;  *Woodward v. Pike*, 43 Neb., 777;  *Patten v. Lane*, 45 Neb., 373;  *Havemeyer v. Paul*, 45 Neb., 373.)  If, however, we accept the referee's report of the value of the goods on hand and his finding of the amount of the proceeds of those sold as above given, and no plaintiff or intervenor questions this, the result shows a greater loss still;  for, while Ford paid out for the goods $9,033.30, he has to show for them only $7,860.    In any event it must be conceded that for the goods, book accounts, and fixtures their full value was actually paid by Ford.    As he bought for a fair price without knowledge of the indebtedness of Erickson, and, therefore, with no intention of

defrauding or hindering Erickson's creditors, there is no sufficient ground for the contention that from the facts established by evidence this transaction should be held fraudulent, and that therefore Ford or the bank should be held liable for the value of the goods received from Erickson. What the intentions of Erickson in the transaction were could not be shown, for he had died before any proofs in this case were taken.

The next question is whether or not the purchase, as a question of law, must be deemed fraudulent as against the creditors of C. L. Erickson. This inference in the first decree was doubtless deemed unavoidable in view of *Bonns v. Carter*, 20 Neb., 566, then believed to embody the established rule of law in this state. In *Kilpatrick-Koch Dry Goods Co. v. Bremers*, 41 Neb., 863, it was pointed out that the majority opinion in the case of *Bonns v. Carter*, *supra*, was contrary in its logic to *Hershiser v. Higman*, 31 Neb., 531, and *Hamilton v. Isaacs*, 34 Neb., 709. In *Jones v. Loree*, 37 Neb., 816, and in *Smith v. Phelan*, 40 Neb., 765, it was unequivocally announced that *Bonns v. Carter* was overruled. It has been repeatedly held that the existence of fraud is a question of fact, and in this case the conveyance was improperly found by the court in its fifth finding to be in conflict with the general assignment law of Nebraska and therefore void. This disposes of all questions necessarily involved, and the judgment of the district court is reversed and this cause is remanded with directions to the district court to dismiss all the petitions filed in this case at the costs of plaintiffs and the intervenors.

REVERSED AND REMANDED.

IRVINE, C., not sitting.