## Bernheim v. Louisville Property Company.

(Decided May 23, 1919.)

### Appeal from Jefferson Circuit Court (Chancery Branch, First Division.)

1. Appeal and Error—Accounting.—This court is a court of errors and not of original jurisdiction, and will not attempt an original accounting of numerous and complicated accounts.

2. Escheat—Sale of Lands by Directors of Corporation.—The question of whether or not lands conveyed were at the time liable to escheat could only furnish a reason for a bona fide sale by the

directors of the corporation owner, and the necessity for a sale being conceded, the question of escheat is not pertinent upon an inquiry as to whether the deed was in fact a bona fide sale.

3. Deeds—Deed Not Bona Fide Sale.—Where such deed, by its terms purported to convey to an insolvent employe of the corporation, real estate worth $1,800,000.00, for the sole consideration of the employe's note for that amount, due in twenty years, without provision for enforcement of either principal or interest within the twenty years, even upon default in the payments of interest, semiannually provided for therein, and he was by secret agreement relieved of all personal liability on the note, and authorized to pay himself a salary out of the income from the property conveyed, and was also prevented from selling the property, except by consent of grantor or its assignee, held that the deed absolute on its face was not a bona fide sale, nor understood or intended by the parties as such.

4. Corporations—Mismanagement—Equitable Relief.—Where for a period of years the directors of a corporation have uniformly and persistently managed and operated its affairs in disregard of its welfare and in the interest of another corporation having no interest therein except as creditor, of which they are also directors, a court of equity applied to by a minority stockholder will relieve the corporation of such mismanagement by removing the directors, and where adequate relief could not be obtained by the election of new directors by the stockholders because of the ownership of a majority of the stock in both corporations by a third corporation, and there is no reason for the continued existence of the corporation, except to sell its property and pay its debts, will take charge of and wind up its affairs.

BLAKEY, QUIN & LEWIS, M. M. LOGAN and ELI BROWN, JR., for appellant. SHACKELFORD MILLER, Amicus Curiae, and GUSTAVUS REMEK, JR., on the same side.

BRUCE & BULLITT, BENJ. D. WARFIELD, H. L. STONE for certain appellees.

WM. AYERS for Cairns heirs.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

By this action in equity the appellant, a minority stockholder, suing in his own right, and on behalf of all such stockholders, seeks primarily to oust the directors, annul a conveyance to Thos. P. Cairns of a large part of the corporate property and to wind up the affairs of the Louisville Property Company, a Kentucky corporation, alleged to have been managed by its directors solely in the interest and for the benefit of another corporation,

the Louisville & Nashville Railroad Company, in disregard of its own welfare and to his hurt, and incidental to this relief recoveries for large amounts are sought upon an accounting for the property company against its directors and against the Louisville & Nashville Railroad Company.

A very large record has resulted from the fact an attempt has been made in both the pleadings and proof to cover in detail practically every corporate act during a period of about fifteen years of a corporation owning real estate in several states worth in the aggregate approximately $2,500,000.00.

Every relief of every kind sought was denied by the chancellor, upon a submission without a reference to the master, and all of these questions of principle and detail are presented and argued upon this appeal, but we can not attempt to perform the difficult task of rendering an original accounting in any event, so we shall at the very outset limit our consideration as nearly as we can to the pleadings and proof upon the main question involved, viz.: whether such mismanagement has been established as authorizes a court of equity to oust the regularly elected directorate, and with the aid of a receiver to wind up the affairs of the corporation, and we shall not attempt to dispose of any but this question, except such of the principal items of detail as can not be avoided in considering the main issue.

As this court is a court of errors and not of original jurisdiction, all questions of accounting upon a final settlement are waived until passed upon by the chancellor, to whom the services of the master are available, as are also all questions not specifically decided.

That the main and all important question referred to above, which is purely one of fact, may be segregated and considered upon its merits, we shall have to eliminate also much of the argument presented which is upon questions of law alike irrelevant and confusing, but before doing this it will be necessary to recite briefly the history of the corporation, the Louisville Property Company.

It was organized in 1898 by the Louisville & Nashville Railroad Company, which owned all of its $50,000.00 of capital stock, simply as a holding company, or de-

pository for the title to real estate that the railroad company believed it would need in the future or that it was forced to buy to protect its previous investments in or advancements to enterprises of individuals or corporations that were a source of transportation business to it, the title to which it was considered inexpedient to hold in the name of the railroad company. It is conceded that for the first ten years of its existence, though nominally a separate corporation, the property company was not in fact a corporate entity, but was merely "a bookkeeping entry" upon the books of the railroad company, without independent corporate aims or purposes or interests. The full purpose of its exstence, such as it had, was to serve the purposes and conveniences of the railroad company, which owned all of its corporate stock and dictated all of its policies. With this period of its existence we are not at all concerned, except as it may explain or account for the subsequent management and control of its affairs by its directors, elected by the Atlantic Coast Line Railroad Company, the owner of the majority of its capital stock, as well as of the L. & N. R. Co., from the officers of the latter company. In March, 1908, the L. & N. R. Co. disposed of all of the stock in the property company in the manner hereinafter detailed, and effected a severance of the two companies, thereby ostensibly and in fact emancipating the property company and setting it up in business to serve its own interests, with no duties to perform for or obligations to the parent company, except to repay it such sums as it then owed it and to secure which the L. & N. R. Co. retained a mortgage lien upon all of the property of the property company.

What it was that prompted this severance does not concern us, and we therefore put aside entirely the question of the motive of this transaction, but with the method we are momentarily concerned, since thereby the conditions were created out of which arose the property rights and obligations involved in this action.

The railroad company had paid for all of the property acquired by the property company, aggregating some $2,000,000.00 or more, except the $50,000.00 the latter company had from the sale of its entire authorized capital stock, and had charged same to the latter upon

its books. The severance of the two companies was effected by increasing the capital stock of the property company to $600,000.00, the railroad company purchasing the $550,000.00 increase at par, and crediting the property company accounts with that amount, and then distributing the stock in the latter company as a stock dividend of 1% to the stockholders of the railroad company (its capital stock being $60,000,000.00). It therefore became necessary as a part of this transaction to sever the property company accounts from those of the railroad company, and this was done by opening a set of books for the former company, and therein debiting it with all amounts advanced by the railroad company, and crediting it with the proceeds of property sales and rentals collected. In the summary thus attained the balance sheets showed at first that the property company had a surplus of $102,455.88, estimating the property owned at its cost price, over its indebtedness of $1,948,135.28 to the railroad company, but later in the final balance sheets this surplus was eliminated by increasing the indebtedness to the railroad company by that amount, or to $2,050,591.16, and this change in its book accounts is the first item of which plaintiff complains, but there is no merit in this charge of mismanagement or bad faith upon the part of the directors of the property company, because it is conclusively proven that in the balance sheets showing this surplus the property company received all proper credits, but had not been charged with any interest on advancements, which was clearly chargeable to it upon an equitable and fair adjustment of accounts, and as this item of interest at the legal rate of 6% largely exceeded the amount of apparent but not real surplus, there was certainly no wrong upon the part of the directors in agreeing to this correction of the first balance sheets, so as to allow the railroad company partial interest on these advancements; especially is this true as to plaintiff and all then stockholders in the two companies, because their L. & N. stock was enhanced in value in exactly the same proportion as their property company stock was depreciated, and besides they received the latter simply as a stock dividend upon the former, and they were in no wise hurt, even if the correction on final settlement of accounts between the companies had been fairly open to

criticism, as it is not; we therefore eliminate this item from further consideration.

The next and principal act of the directors complained of is a deed to one Thos. P. Cairns of date October 16, 1911; and as affecting its validity, the question of whether or not the lands thereby conveyed to him were liable at that time to escheat is elaborately argued by counsel on both sides, but a liability to escheat could only afford a reason for disposing of the property and as all parties agree it was the duty of the directors to sell the property at that time, the whole question of escheat, not directly involved in this action, nor pertinent upon an inquiry as to whether the deed was in fact a *bona fide* sale may be dismissed from consideration.

This brings us to a consideration of the validity of the Cairns deed, by which, on its face, the property company conveyed to Cairns the fee simple title to all of its real estate in Kentucky, being about three-fourths of all property owned by it, and worth at least $1,800,000.00, upon terms so remarkable and unusual as to at least require of the parties thereto in this action attacking its validity, a full, fair and satisfactory explanation, as is apparent from the mere statement of admitted facts. Cairns was an old man entirely without means, who did not pay a dollar down upon the trade, nor did he obligate himself for the payment of a single dollar in any event, except out of the proceeds of the sale of the property in the event and as he sold it or any part thereof within twenty years, during which time, or until his death, he was to and did receive from the property company a salary of $250.00 per month and expenses from the income of the property. We say that he did not obligate himself to pay a single dollar for this property although he did at the time the deed was made to him, October 16, 1911, execute to the property company his note for $1,800,000.00 due in twenty years, and to secure the payment of which he executed to the property company a mortgage on the same property conveyed by it to him; but we find that just one week later, on October 23, 1911, the parties to this remarkable real estate transaction reduced to writing and signed a secret agreement for no consideration whatever, except to have in writing the whole agreement, the principal stipulation of which was a release of Cairns from per-

sonal liability upon the $1,800,000.00 note he had executed to the property company; and yet we are asked by learned counsel for appellee to accept the bare and cold recital of the deed as sufficient evidence to show that this was a *bona fide* transaction, behind which neither a stockholder of the corporation nor a court of equity might look. We are even asked to believe that this secret contract of October 23rd is a separate and independent transaction and not to be considered as a part of the deed itself in order to determine its validity, although its preamble states it was made in order that there should be a definite understanding "as to certain other matters not necessary to be set forth in said deeds or mortgage, but as to which there should be a written agreement."

We are entirely unable to see how any one can examine this transaction and believe for one moment that it was in fact or considered by either party a *bona fide* sale on the part of the property company to Cairns, of nearly $2,000,000.00 of real estate for not a single dollar in cash, but for his note merely, and that not due for twenty years, with no provision for acceleration of the maturity date in case of default in interest payments, and even the remote possibility of its being collectible at maturity guarded against by a secret agreement between the parties. Except by the mere force of the formal language employed in the deed, there is nothing to suggest a real transaction between the parties. Cairns not only parted with nothing as a consideration for the deed, but as a matter of fact he took nothing thereunder, because he could not sell or dispose of a single piece of the property except and until he got the consent of the L. & N. R. Co., and this Cairns seems to have thoroughly understood, because for a time, at least, after the conveyance to him, just as he had done theretofore, when writing to the officials of the property company or the L. & N. R. Co., about the property, he signed himself as "General Manager," evidently not having comprehended, as now asserted by defendants, that instead of being an employed manager or agent, he had become the real owner of this vast property without the payment of or even a liability to pay therefor a single solitary dollar of his own money. It

is not at all surprising that it took some time for this alleged fact to sink in. Nor is it hard from this record to ascertain with exact certitude the real and only purpose of this transaction. Although the L. & N. R. Co. did not own a dollar of the stock of the Louisville Property Company, and had no right to even a consideration of its interests when a sale of any of the property of the property company was contemplated or made, except as a lien holder, yet we find that the directors of the property company, when confronted with the necessity to sell its property and turn it into cash as speedily as possible, adopted a plan which brought to that company not a single dollar of money, except when and as Cairns, during a period of twenty years, might sell, but even this chance of getting something out of its property, could not be realized unless the L. & N. R. Co., to whom the property company's lien was at once assigned, would agree to the sale.

This arrangement, which so uiy served the purposes of the property company, put it in the power of the L. & N. R. Co. by merely objecting, to defeat a sale of any of the property which had originally been acquired solely to serve its anticipated future needs, no matter how advantageous such a sale might appear from the standpoint of the property company or Cairns, and the conclusion is unescapable that this whole transaction was engineered and put over by the directors and officers of the property company, who were also officers in the L. & N. R. Co., in order that that property might still be available throughout the twenty years or longer to the railroad company, as and when that company needed it, especially since Mr. Mapother admits the details were all arranged by himself and associates in the management of the two companies before Cairns was even consulted; and this transaction but fitly illustrates the inability of any man or set of men, however upright and well meaning, to serve two masters at the same time, and that fact is not only exemplified by this transaction, as well as some of the evils of interlocking directorates, but is also the most patent fact in all the testimony of Mr. Mapother, who for years has attempted the difficult role of serving at the same time as vice-president of both of these companies, whose interests

since their legal severance in 1908 have been almost diametrically opposed to each other.

The property company was authorized by its charter only to buy, own, hold, lease and sell property; nearly, if not all, of this property was unprofitable as an investment, and certainly ought to have been sold as promptly and as advantageously as possible after the company was legally separated from L. & N. control in 1908, either for reinvestment of the proceeds where profits were probable, or more properly to wind up the affairs of this corporation, whose very corporate purposes were at an end when its connections with L. & N. R. Co. were severed. The L. & N. R. Co. on the other hand would need this property, or much of it, as its business developed, and although it now owned no interest in and had no right to control the policies of the property company, it was patently to its interest that this property should be left where the L. & N. could get it as it needed it. And this is exactly and all the Cairns transaction did or was intended to do, and this was thoroughly understood by all parties at all times, as is clearly apparent by their subsequent acts; and neither its force nor effect was enlarged or strengthened by the subsequent ratification of either the directors or the stockholders, even if regularly done, so we need not consider the elaborate discussion in briefs as to the regularity of such ratifications as were attempted.

Mr. Mapother, as was not unnatural, knowing the real purposes and effect of the Cairns arrangement, shows by his testimony the utter inability of himself and his associates to lose sight of the fact that the property company was organized and acquired its property for the sole purpose of serving the interest of the L. & N. R. Co., or to believe the severance of 1908 in reality changed the relationship between the two companies, and strangely enough this hallucination as to the continued relationship between the companies after 1908 appears in the argument of learned counsel for the defendants, when they attempt to argue against the plaintiff as an estoppel to his objecting to the property company being managed in the interest of the railroad company, the fact that he knew that the property company was organized and its property acquired, to serve the

purposes of the railroad company, and even stranger than this, it is actually pleaded in the answer of defendants, that the affairs of the property company have been managed by the directors since its legal severance from the L. & N. R. Co. in 1908, in the same manner as theretofore, thus:

"Moreover defendants say that such property in other states than in Kentucky as has been acquired since the aforesaid distribution of stock, has been acquired *in the same* way and *for the same purposes and reasons* as existed with reference to the acquisition of property which had been acquired by the Louisville Property Company prior to said distribution of stock and the handling of the property has been of the same character as the handling of the property of said corporation prior to said distribution."

And this admission in the pleading is fully borne out by the testimony of Mr. Mapother, who said:

"I recall no distinction in the method of management as regards 1908 and subsequent to that time. If by 'management' you mean the care of the property, the payment of taxes, the renting of property, the collection of rents, and *the sales of any parcels* and *the say as* to which parcels were desirable or the acquisition of any parcels thought to be necessary—the general management of the company as to the management of the property which the company owned was substantially the same as far as I now recall prior to 1908 as it was subsequent to 1908."

And yet it is admitted in the pleadings, the proof and argument of counsel that prior to 1908 the property company was managed and operated and in fact existed solely to serve the L. & N. R. Co. So far as the officials of the two companies are concerned, they seem never to have given any force or effect to the legal separation of the two companies in 1908, since which time the interests of the L. & N. R. Co. have had no right to a consideration in the management of the affairs of the property company, because since that date the L. & N. R. Co. has not even owned a dollar's worth of the stock of the property company. In addition to this admission in both the pleadings and the evidence of defendant, which in our judgment is a confession of such

mismanagement as to exhibit the right upon the part of the plaintiff to the main relief sought by this proceeding, in the evidence for the plaintiff are many circumstances which show conclusively that since 1908, just as before that time, the directors elected by the majority stockholder, also a majority stockholder in the L. & N. Co., have believed and acted upon the belief that it was their duty to manage the property company in the interest of the railroad company, and because of this belief these directors, who are men of unimpeachable character and integrity, have nevertheless and without corrupt motives or profit to themselves, utterly misconceived their duties as directors in the property company, and as a consequence their management of its affairs in the interest of the L. & N. R. Co. has been and is a fraud upon the rights of all the minority stockholders in the property company, who did not happen to be also stockholders in the L. & N. R. Co.

As illustrative of this ultimate fact that the directors have persistently managed its affairs in the interest of the L. & N. R. Co., we cite the following facts in addition to the Cairns transaction:

From the date of the separation of the two companies in 1908 until the trial of this action, never a piece or parcel of this property originally bought for L. & N. purposes seems to have been sold to anyone by the property company or Cairns, but the L. & N. R. Co., except four city lots hereinafter referred to, despite the fact the necessity for a sale was recognized by all parties, the Cairns deed was made ostensibly for that purpose, and it was stipulated in the agreement of October 23, 1911, that Cairns should "make active and zealous effort to sell the lands and mineral rights" conveyed to him; and yet when in 1913, after Cairns' death, Mr. Heath, the acting trustee or agent, designated by the L. & N. R. Co. as assignee of property company to manage the Cairns lands, recommended the sale of certain property as advantageous to all parties to Mr. Mapother, the president of the property company, which was in urgent need of selling and getting its money out of the property, the latter wrote him: "Generally speaking I am averse to any diminution of the present acreage, but if after the careful investigation which you

intend to make it should be shown conclusively that the disposition would be advantageous to the estate (the Cairns estate doubtless) the Louisville Property Company will not be disposed to offer any objection."

In so far as we are able to ascertain from the record, there has never been but one sale of any of the property owned by the property company either before or after the Cairns deed, to any one except the L. & N., and that sale was made after October 19, 1911, and therefore after the Cairns deed, because on that date Mr. Mapother, then a vice-president of both companies, wrote to Mr. M. H. Smith, the president of both, recommending the sale of four lots in Louisville to the Ewald Iron Company at $3,000.00, although valued by Mr. Bradford, the real estate agent of L. & N., and who frequently acted as such for the property company, at $4,200.00, and assigning as the reason why these lots should be sold: "Their location is such that the L. & N. R. Co. is not likely to ever have any need of them."

It is shown that in leases made by the property company, after severance from the L. & N. R. Co., it was customary to insert a clause releasing the L. & N. R. Co. from liability for damage from fire from its engines, although the insertion of this clause for the benefit of a stranger must have been at some cost in rentals to the property company, the sole owner of the property.

All inquiries of prospective purchasers of any of the property of the property company uniformly elicited the response that the property was not for sale.

Many more incidents might be cited from the record illustrative of the same fact, but these are certainly sufficient to show conclusively that the property company has been managed by its directors in utter disregard of its own urgent needs and best interests in order that its assets might be at all times available to the L. & N. R. Co.

Therefore, since it has been established that the so-called deed to Cairns was not in fact a deed, and did not in any way change his status as an employe or the property company's title to the lands described therein, it is manifest that the deed should be cancelled and held for naught, in order that a sale of the property may not longer be thereby obstructed.

It is also apparent, in fact confessed, that a sale of this property is and has been at all times, at least since 1908, urgently demanded by every consideration of the welfare of the property company, whether from a standpoint of corporate powers or corporate needs, and that this can not be accomplished so long as the L. & N. R. Co., through an interlocking directorate, retains the power to control and restrain a sale in accordance with its interests and purposes.

It is equally apparent that because of the ownership of a majority of the stock in both companies by the same party, no relief would be afforded to minority stockholders in the property company by an election of new directors, which would but change the personnel, but could not alter the policy of the board of directors to the extent of freeing the company from domination by the Atlantic Coast Line Railroad Company in the interest of the L. & N. R. Co. It is therefore necessary for the court to assume control of the company's affairs through a receiver until the properties can be disposed of and its indebtedness to the L. & N. R. Co. paid off, and since all parties agree the properties must be sold, and since the real purposes of the corporate existence to buy, own, hold and sell the property for the purposes and uses of the L. & N. R. Co. were extinguished by the legal separation of the two companies in 1908, and there is neither suggested nor apparent any other reason for its continued existence, if perchance there should be anything left upon which it could exist after satisfying the L. & N. R. Company's mortgage lien upon all of the property company's assets, the properties should be sold by order of court and the proceeds, if any, after satisfying this lien, should be distributed to those entitled thereto upon a final settlement of the affairs of the corporation.

Wherefore the judgment dismissing the petition is reversed and the cause remanded for an accounting and all proceedings necessary to a final settlement of the affairs of the corporation not inconsistent herewith.

The whole court sitting, except Chief Justice Carroll, who was absent, and Judge Quin, who was at one time an attorney in the case.