Statement of the Case.
MONROE, J.
This is an action in damages for an alleged malicious suit, and for libelous matter said to have been contained in the pleadings therein.
Plaintiff alleges: That he brought suit against A. M. & C. C. Elder for rent, and caused a writ to be issued under which five mules and two horses were seized. That defendant (a corporation) intervened and alleged that, some time during the month of September, 1905, it and its representatives informed the said John W. Carnes of its absolute ownership of—
“said live stock, and that it had advanced to the said A. M. & C. C. Elder under an express agreement that all the cotton produced by them * * * should be ginned in its gin at Lake End, La., and, on the promise made then and there by the said J. W. Carnes that the cotton raised by the said A. M. & C. C. Elder should and would be by him first imputed to the payment of the rent claimed by him against the said Elders, it agreed and did release the said Elders from ginning their cotton at Lake End, •and permitted the live stock belonging to it to remain in the possession of the said Elders and on the leased premises described in plaintiff’s petition.”
That defendant further alleged in its said intervention:
“That, in order to deprive him (it) of his (its) property, the said J. W. Carnes and the said A. M. & C. C. Elder colluded together and imputed the proceeds of the cotton aforesaid to some imaginary claim or debt for supplies, the doing of which was a legal fraud on the rights of your petitioner (intervener). That, in carrying out the conspiracy aforesaid to defraud your petitioner and deprive him (it) of his (its) property, the writs of provisional seizure were sent out, the same being with the consent of the said Elders. That the said Elders do not owe the said Carnes anything for rent. That the said A. M. & C. C. Elder are notoriously insolvent, and this is an attempt on their part, with the sanction and consent of the said J. W. Carnes, to pay some debt they might owe with petitioner’s property.”
Plaintiff further alleges that said intervention was read in open court, in the presence of many people, and has become part of the public records of the parish. That all of said allegations were false and without probable cause, to the knowledge of defendant; were made by it deliberately and maliciously, and were calculated, and tended, to injure plaintiff’s good name and standing, and that he has thereby been damaged to the extent of $5,000—
“by the said libel and slander and malicious suit, by the insult and affront to his good name and business reputation, and by the vexation, humiliation, annoyance, and outrage to his feelings,” etc.
Defendant, after interposing an exception of “no cause of action,” answered, averring, in substance, that the allegations contained in its intervention, and here complained of, were pertinent and necessary in the proper presentation of the claim set up by it. That they were made by advice of counsel, in good faith, with probable cause, with no intent to injure or defame the plaintiff, and that they were, and are, privileged.
“That skid allegations, in the opinion of defendant, were true, and that, according to its understanding and firm and honest belief, the contract set up in said petition of intervention, relative to said live stock and the cotton and the account of the said Elders, is the true agreement had with the said Carnes by it and its officers, and that-he violated the same.”
It further alleges that the district court found that said allegations were made in good faith, with probable cause, and were pertinent to the issues presented; that its finding was not, in that respect, disturbed by the Court of Appeal; and that the judgments of said courts constitute res judicata as to plaintiff’s present demands. It further pleads the prescription of one year.
*29 It appears from the evidence adduced that the Elders were tenants of plaintiff; that they were indebted to him for rent, and, on open account, for advances; and that they were under obligations to turn over their crop (of cotton) to him in payment of their debt. It also appears, however, that they had entered into a contract with defendant, whereby they had agreed, in consideration of advances to be made, to turn over their crop to it, to be ginned and sold, and whereby also they had apparently sold to it the live stock referred to in the intervention which has given rise to this suit.
That being the situation, a disagreement occurred between C. C. Elder and defendant’s president, which, with perhaps other matters, led the latter to become somewhat concerned about the debt due to his company and about the mules and horses, for which defendant held a bill of sale but which were in the possession of the Elders, on the land rented by them from plaintiff, and he (the president) called on plaintiff and had quite an extended conversation with him, in which plaintiff learned, to his surprise, that his tenants were indebted to defendant for advances and had agreed to sell all their cotton to its gin, and as a result of which defendant’s president, who at first appeared excited and suspicious, went away apparently satisfied. It is shown by the testimony or admissions on both sides that defendant’s president had some papers with him, and that he either read them to plaintiff or stated their contents to him, as showing the relations between defendant and the Elders, and plaintiff admits that he reassured him by telling him that he thought the Elders would pay all they owed, and that he (plaintiff) would keep nothing hid from him (the president). The president testifies that he told plaintiff that defendant owned the live stock, and that plaintiff gave him to understand that he would apply the proceeds of the cotton that he might get from the Elders, first, to the payment of his rent, thereby pro tanto releasing the live stock from his lessor’s privilege, and, in effect, that he would see that defendant was protected with respect to its claim against the Elders. This is flatly denied by plaintiff, who says that the president did not mention the stock, and that there was no such understanding. The conversation took place in plaintiff’s store, and was heard in part by O. H. Terry, a business associate and relative of plaintiff, who says that he heard nothing of the live stock or the understanding. I-Ie admits, however, that he probably waited on several customers while the conversation was going on, and that he did not hear all of it, so that his testimony amounts to nothing in the way of corroboration, and the court is left, as were the district court and the Court of Appeals (in the suit in which the intervention was filed), to decide as between the conflicting statements of the two parties mainly interested. Leaving that matter as it stands, and proceeding with the statement of the facts leading to the present litigation, defendant’s president parted with plaintiff with his feelings soothed and his suspicions quieted, and nothing happened until the Elders had about made their crop, when plaintiff, learning that they (or C. C. Elder) had delivered five bales of their cotton (picked from a detached tract of the rented land) to defendant, instituted suit against them and caused the live stock in question, with other property, to be seized, and thereupon defendant intervened and made the allegations of which plaintiff now complains. The case thus made up was decided by the district court in favor of plaintiff, and the judgment so rendered was affirmed by the Court of Appeals, both courts holding that the bill of sale of the mules and horses, held by defendant, was intended to operate as a security, and that defendant was not, therefore, the owner of *31 the animals. The present suit was instituted some 19 months after the filing of the intervention containing the language complained of, and within the year after the decision of the case on appeal. A single witness testified upon the subject of damages, and he tells us that plaintiff is a man of excellent business standing, so far as he knows, and of means; that charges such as those contained in defendant’s intervention would “injure almost any one, under ordinary circumstances,” but that he never heard of the charges here in question until they were read to him in court, and, in substance, that he knew of no one who had heard of them. It is shown that defendant’s president explained to its counsel the situation about as it had been stated here, giving, of course, his version of the conversation between plaintiff and himself, and that the framing of the intervention was left to the counsel. Both the president and the counsel deny that they were actuated by malice, and the counsel testifies that he included the allegations complained of only because, having obtained the information on which they are predicated from his client, who exhibited no malice towards plaintiff, he believed them to be pertinent to the issues involved and necessary to the maintenance of his suit.
Opinion.
Dealing, first, with defendant’s plea of prescription: It is the generally accepted rule that, in order to maintain an action of this kind, plaintiff must prove, among other things, that he has been prosecuted by defendant, either criminally or in a civil proceeding, and that the prosecution has been determined favorably to him. Murphy v. Redler, 16 La. Ann. 1; Davis v. Stuart, 47 La. Ann. 378, 16 South. 871; 26 Cyc. pp. 55, 56.
The reason of the rule, in so far as it applies to actions in damages for alleged malicious criminal prosecutions, or alleged malicious civil proceedings in which the element of libel is lacking, is that, until the prosecution is determined by the court having jurisdiction thereof, it cannot be known that such court will not sustain it, and in so doing hold, not only that there was probable, but that there was sufficient, cause, and, as such ruling would relate back to the institution of the prosecution or proceeding, it would necessarily follow that during the interval there could have been, in contemplation of law, no injury, and hence no cause or right of action. It is evident, however, that whether it be true of a criminal prosecution or not, a civil suit may be malicious and without probable cause without being libelous, and, where the libel complained of is contained in the pleadings in such suit, the claim for damages may survive, even though the suit be determined adversely-to the defendant, as, for instance, if one be sued on a promissory note, and falsely, maliciously, impertinently, and without probable cause, characterized in the petition as a thief and ex-convict, he may properly be condemned for the amount represented by the note, but we know of no reason why he should thereby be precluded from recovering damages for the libel.
In the instant case, plaintiff combines a claim for damages for the bringing of an alleged malicious civil proceeding with a claim for damages for libelous and injurious language used in the pleadings therein, and the question is presented whether both claims are governed by the same rule, particularly as to the matter of prescription.
We have seen that, quoad the claim for damages merely for the bringing of the alleged malicious suit, there is no legal injury until the suit is determined by the court vested with jurisdiction, hence the prescription of the action does not begin to run until that time. The Civil Code provides:
*33 “Art. 3536. The following actions are also prescribed by one year: That for injurious words, whether verbal or written,” etc. “That for the delivery of merchandise. * * *
“Art. 3537.. The prescription mentioned in the preceding article runs, with respect to the merchandise * * * from the day of the arrival of the vessel, or that on which she ought to have arrived. And, in other cases, from that on which the injurious words, disturbances, or damages were sustained.”
As the law makes no distinction as to the manner in which the injurious words, in ease of libel, are published, it might be argued that where, as in this case, they are used in.pleadings filed In court, the prescription of the action for damages runs from the date of the filing. If, however, the court in which the pleadings have been filed eventually holds that the words are pertinent and material to the issue to be decided, or were used with probable cause, we have the same situation as when an alleged malicious prosecution is sustained — the decision relates back to the date at which the words were used, and, in effect, bolds that they were lawfully used, and that the damage resulting therefrom is damnum absque injuria, from which it follows that, during the interval, the question, whether the words are, in legal contemplation, injurious, is held in abeyance, and it is only when, by the judgment in the case in which the matter can be determined, it is ascertained that the words are injurious, that the prescription of the action for damages begins to run, since that prescription relates to actions for “injurious words.”
The plea of prescription is therefore overruled.
On the merits of the case: If the understanding, testified to by defendant’s president, and upon the basis of which, as stated by that officer and by defendant’s counsel, the' latter filed the petition of intervention here complained of, really existed, or if defendant’s president had reasonable ground for believing that it existed, plaintiff has not madb out his case, since, if plaintiff had given the president to understand that he would collect his rent from the proceeds of his tenants’ cotton, and thereby release the live stock of which defendant held a bill of sale, and on account of which it had unquestionably advanced money, and bad further given him to understand that he would keep him advised of what was going on, or would keep nothing hid from him, then', when without notice to defendant he sued his tenants and seized the live stock, as well as the crop, for his rent, and the tenants practically acquiesced in the seizure, defendant’s intervention was authorized, and the allegations that plaintiff had violated his agreement and was acting in collusion with his tenants were pertinent and material; in fact, they were about the only allegations upon which the claim asserted in the intervention could have been sustained.
Plaintiff’s testimony, to the effect that there was no such understanding as that relied on by defendant, is met by that of defendant’s president, who testifies, positively and circumstantially, that there was such an understanding. The testimony of Terry, in our opinion, is as corroborative of the president’s as of the plaintiff’s, for, whilst he says that he did not hear the live stock referred to, it is quite evident that there was a great deal of the conversation that he did not hear, and both he and plaintiff testify that the president came to the store for the purpose of discussing with plaintiff the relations between plaintiff, defendant, and the Elders, that they were engaged in that discussion for nearly, or quite, an hour, and that during the discussion, the president exhibited certain papers wbicb, as the witness thinks, were either read by plaintiff or read to him. As otherwise appears, about the only papers in the president’s possession which relate to *35 the subject of tbe conversation were tbe contract whereby the Elders had agreed to send their cotton to defendant’s gin in consideration of advances to be made to them, and the bill of sale of the mules and horses, and it is admitted that plaintiff either read or was told the substance of the contract. Why, under the circumstances, he should not have been informed of defendant’s real or supposed relation to tbe mules and horses, does not appear. He testifies that he was not so informed, and we do not undertake to hold that he was. On the other hand, defendant’s president testifies that plaintiff was so informed, and we find nothing in the surrounding circumstances to justify us in holding that this testimony is not as worthy belief as that of plaintiff. All parties agree that, whereas the president came to plaintiff’s store, apparently excited, and suspicious of plaintiff, he went away apparently soothed and satisfied.
The burden of proof to show that defendant acted without real or probable cause rests upon the plaintiff.
In Barton v. Kavanaugh, 12 La. Ann. 333 (being an action in damages for malicious arrest), the court said that the following requested charge should have been given, to wit:
“That the plaintiff must not only prove malice, but must also show that there was no probable cause for the prosecution, and that the defendant is not bound to prove probable cause until the plaintiff has shown the absence of it; and that, if plaintiff shows malice and not the want of probable cause, defendant cannot be condemned, as it is just as necessary to show the want of probable cause as it is malice, before a recovery can be made.”
• In the case at bar, there has been no attempt to show actual malice, which has been disclaimed under oath, and the burden resting on plaintiff to prove want of probable cause has not been discharged.
Judgment affirmed.