## HECK *v.* HUMPHREY ET AL.

No. 93–6188.   Argued April 18, 1994—Decided June 24, 1994

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and KENNEDY, THOMAS, and GINSBURG, JJ., joined. THOMAS, J., filed a concurring opinion, *post*, p. 490. SOUTER, J., filed an opinion concurring in the judgment, in which BLACKMUN, STEVENS, and O'CONNOR, JJ., joined, *post*, p. 491.

*Charles Rothfeld* argued the cause and filed briefs for petitioner.

*Matthew R. Gutwein* argued the cause for respondents. With him on the brief were *Pamela Carter*, Attorney General of Indiana, and *Arend J. Abel* and *Dana Childress-Jones*, Deputy Attorneys General.*

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether a state prisoner may challenge the constitutionality of his conviction in a suit for damages under 42 U. S. C. § 1983.

## I

Petitioner Roy Heck was convicted in Indiana state court of voluntary manslaughter for the killing of Rickie Heck, his wife, and is serving a 15-year sentence in an Indiana prison. While the appeal from his conviction was pending, petitioner,

---

*A brief of *amici curiae* was filed for the State of Arizona et al. by *Grant Woods*, Attorney General of Arizona, *Paul J. McMurdie*, and *Linda L. Knowles*, and by the Attorneys General for their respective States as follows: *James H. Evans* of Alabama, *Winston Bryant* of Arkansas, *Daniel E. Lungren* of California, *Robert A. Butterworth* of Florida, *Larry EchoHawk* of Idaho, *Roland W. Burris* of Illinois, *Chris Gorman* of Kentucky, *Michael C. Moore* of Mississippi, *Joseph T. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Deborah T. Poritz* of New Jersey, *Lee Fisher* of Ohio, *T. Travis Medlock* of South Carolina, *Mark W. Barnett* of South Dakota, *Dan Morales* of Texas, *Jan Graham* of Utah, and *Joseph B. Meyer* of Wyoming.

proceeding *pro se*, filed this suit in Federal District Court under 42 U. S. C. § 1983,[1] naming as defendants respondents James Humphrey and Robert Ewbank, Dearborn County prosecutors, and Michael Krinoph, an investigator with the Indiana State Police. The complaint alleged that respondents, acting under color of state law, had engaged in an "unlawful, unreasonable, and arbitrary investigation" leading to petitioner's arrest; "knowingly destroyed" evidence "which was exculpatory in nature and could have proved [petitioner's] innocence"; and caused "an illegal and unlawful voice identification procedure" to be used at petitioner's trial. App. 5–6. The complaint sought, among other things, compensatory and punitive monetary damages. It did not ask for injunctive relief, and petitioner has not sought release from custody in this action.

The District Court dismissed the action without prejudice, because the issues it raised "directly implicate the legality of [petitioner's] confinement," *id.*, at 13. While petitioner's appeal to the Seventh Circuit was pending, the Indiana Supreme Court upheld his conviction and sentence on direct appeal, *Heck* v. *State*, 552 N. E. 2d 446, 449 (Ind. 1990); his first petition for a writ of habeas corpus in Federal District Court was dismissed because it contained unexhausted claims; and his second federal habeas petition was denied, and the denial affirmed by the Seventh Circuit.

When the Seventh Circuit reached petitioner's appeal from dismissal of his § 1983 complaint, it affirmed the judgment and approved the reasoning of the District Court: "If, regardless of the relief sought, the plaintiff [in a federal civil

---

[1] Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

rights action] is challenging the legality of his conviction,[2] so that if he won his case the state would be obliged to release him even if he hadn't sought that relief, the suit is classified as an application for habeas corpus and the plaintiff must exhaust his state remedies, on pain of dismissal if he fails to do so." 997 F. 2d 355, 357 (1993). Heck filed a petition for certiorari, which we granted. 510 U. S. 1068 (1994).

## II

This case lies at the intersection of the two most fertile sources of federal-court prisoner litigation—the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U. S. C. § 1983, and the federal habeas corpus statute, 28 U. S. C. § 2254. Both of these provide access to a federal forum for claims of unconstitutional treatment at the hands of state officials, but they differ in their scope and operation. In general, exhaustion of state remedies "is *not* a prerequisite to an action under § 1983," *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 501 (1982) (emphasis added), even an action by a state prisoner, *id.*, at 509. The federal habeas corpus statute, by

---

[2] Neither in his petition for certiorari nor in his principal brief on the merits did petitioner contest the description of his monetary claims (by both the District Court and the Court of Appeals) as challenging the legality of his conviction. Thus, the question we understood to be before us was whether money damages premised on an unlawful conviction could be pursued under § 1983. Petitioner sought to challenge this premise in his reply brief, contending that findings validating his damages claims would not invalidate his conviction. See Reply Brief for Petitioner 5–6. That argument comes too late. We did not take this case to review such a fact-bound issue, and we accept the characterization of the lower courts.

We also decline to pursue, without implying the nonexistence of, another issue, suggested by the Court of Appeals' statement that, if petitioner's "conviction were proper, this suit would in all likelihood be barred by res judicata." 997 F. 2d 355, 357 (CA7 1993). The res judicata effect of state-court decisions in § 1983 actions is a matter of state law. See *Migra* v. *Warren City School Dist. Bd. of Ed.*, 465 U. S. 75 (1984).

contrast, requires that state prisoners first seek redress in a state forum.[3]   See *Rose* v. *Lundy,* 455 U. S. 509 (1982).

*Preiser* v. *Rodriguez,* 411 U. S. 475 (1973), considered the potential overlap between these two provisions, and held that habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983.   *Id.,* at 488–490.   We emphasize that *Preiser* did *not* create an exception to the "no exhaustion" rule of § 1983; it merely held that certain claims by state prisoners are not *cognizable* under that provision, and must be brought in habeas corpus proceedings, which do contain an exhaustion requirement.

This case is clearly not covered by the holding of *Preiser,* for petitioner seeks not immediate or speedier release, but monetary damages, as to which he could not "have sought and obtained fully effective relief through federal habeas corpus proceedings." *Id.,* at 488.   See also *id.,* at 494; *Allen* v. *McCurry,* 449 U. S. 90, 104 (1980).   In dictum, however, *Preiser* asserted that since a state prisoner seeking only damages "is attacking something other than the fact or length of . . . confinement, and . . . is seeking something other than immediate or more speedy release[,] . . . a damages action by a state prisoner could be brought under [§ 1983] in federal court without any requirement of prior exhaustion of state remedies." 411 U. S., at 494.   That statement may not be true, however, when establishing the basis for the damages claim necessarily demonstrates the invalidity of the

---

[3] Title 28 U. S. C. § 2254(b) provides: "An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner."

conviction. In that situation, the claimant *can* be said to be "attacking . . . the fact or length of . . . confinement," bringing the suit within the other dictum of *Preiser:* "Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983." *Id.,* at 490. In the last analysis, we think the dicta of *Preiser* to be an unreliable, if not an unintelligible, guide: that opinion had no cause to address, and did not carefully consider, the damages question before us today.

Before addressing that question, we respond to petitioner's contention that it has already been answered, in *Wolff* v. *McDonnell,* 418 U. S. 539 (1974). See Reply Brief for Petitioner 1. First of all, if *Wolff* had answered the question we would not have expressly reserved it 10 years later, as we did in *Tower* v. *Glover,* 467 U. S. 914 (1984). See *id.,* at 923. And secondly, a careful reading of *Wolff* itself does not support the contention. Like *Preiser, Wolff* involved a challenge to the procedures used by state prison officials to deprive prisoners of good-time credits. The § 1983 complaint sought restoration of good-time credits as well as "damages for the deprivation of civil rights resulting from the use of the allegedly unconstitutional procedures." *Wolff, supra,* at 553. The Court said, after holding the claim for good-time credits to be foreclosed by *Preiser,* that the damages claim was nonetheless "properly before the District Court and required determination of the validity of the procedures employed for imposing sanctions, including loss of good time," 418 U. S., at 554. Petitioner contends that this language authorized the plaintiffs in *Wolff* to recover damages measured by the actual loss of good time. We think not. In light of the earlier language characterizing the claim as one of "damages for the deprivation of civil rights," rather than damages for the deprivation of good-time credits, we think this passage recognized a § 1983 claim for using the

wrong procedures, not for reaching the wrong result (*i. e.*, denying good-time credits). Nor is there any indication in the opinion, or any reason to believe, that using the wrong procedures necessarily vitiated the denial of good-time credits. Thus, the claim at issue in *Wolff* did *not* call into question the lawfulness of the plaintiff's continuing confinement. See *Fulford* v. *Klein*, 529 F. 2d 377, 381 (1976), adhered to, 550 F. 2d 342 (CA5 1977) (en banc); Schwartz, The *Preiser* Puzzle: Continued Frustrating Conflict Between the Civil Rights and Habeas Corpus Remedies for State Prisoners, 37 DePaul L. Rev. 85, 120–121, 145–146 (1988).

Thus, the question posed by § 1983 damages claims that do call into question the lawfulness of conviction or confinement remains open. To answer that question correctly, we see no need to abandon, as the Seventh Circuit and those courts in agreement with it have done, our teaching that § 1983 contains no exhaustion requirement beyond what Congress has provided. *Patsy*, 457 U. S., at 501, 509. The issue with respect to monetary damages challenging conviction is not, it seems to us, exhaustion; but rather, the same as the issue was with respect to injunctive relief challenging conviction in *Preiser:* whether the claim is cognizable under § 1983 at all. We conclude that it is not.

"We have repeatedly noted that 42 U. S. C. § 1983 creates a species of tort liability." *Memphis Community School Dist.* v. *Stachura*, 477 U. S. 299, 305 (1986) (internal quotation marks omitted). "[O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983 as well." *Carey* v. *Piphus*, 435 U. S. 247, 257–258 (1978). Thus, to determine whether there is any bar to the present suit, we look first to the common law of torts. Cf. *Stachura, supra*, at 306.

The common-law cause of action for malicious prosecution provides the closest analogy to claims of the type considered here because, unlike the related cause of action for false arrest or imprisonment, it permits damages for confinement imposed pursuant to legal process. "If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 888 (5th ed. 1984). But a successful malicious prosecution plaintiff may recover, in addition to general damages, "compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of the society." *Id.*, at 887–888 (footnotes omitted). See also *Roberts* v. *Thomas*, 135 Ky. 63, 121 S. W. 961 (1909).

One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused. Prosser and Keeton, *supra*, at 874; *Carpenter* v. *Nutter*, 127 Cal. 61, 59 P. 301 (1899). This requirement "avoids parallel litigation over the issues of probable cause and guilt . . . and it precludes the possibility of the claimant [sic] succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." 8 S. Speiser, C. Krause, & A. Gans, American Law of Torts § 28:5, p. 24 (1991). Furthermore, "to permit a convicted criminal defendant to proceed with a malicious prosecution claim would permit a collateral attack on the conviction through the vehicle of a civil suit." *Ibid.*[4] This Court has long expressed

---

[4] JUSTICE SOUTER criticizes our reliance on malicious prosecution's favorable termination requirement as illustrative of the common-law principle barring tort plaintiffs from mounting collateral attacks on their out-

similar concerns for finality and consistency and has generally declined to expand opportunities for collateral attack, see *Parke* v. *Raley*, 506 U. S. 20, 29–30 (1992); *Teague* v. *Lane*, 489 U. S. 288, 308 (1989); *Rooker* v. *Fidelity Trust Co.*,

---

standing criminal convictions. Malicious prosecution is an inapt analogy, he says, because "[a] defendant's conviction, under Reconstruction-era common law, dissolved his claim for malicious prosecution because the conviction was regarded as irrebuttable evidence that the prosecution never lacked probable cause." *Post*, at 496, citing T. Cooley, Law of Torts 185 (1879). Chief Justice Cooley no doubt intended merely to set forth the general rule that a conviction defeated the malicious prosecution plaintiff's allegation (essential to his cause of action) that the prior proceeding was without probable cause. But this was not an absolute rule in all jurisdictions, see *Goodrich* v. *Warner*, 21 Conn. 432, 443 (1852); *Richter* v. *Koster*, 45 Ind. 440, 441–442 (1874), and early on it was recognized that there must be exceptions to the rule in cases involving circumstances such as fraud, perjury, or mistake of law, see *Burt* v. *Place*, 4 Wend. 591 (N. Y. 1830); *Witham* v. *Gowen*, 14 Me. 362 (1837); *Olson* v. *Neal*, 63 Iowa 214, 18 N. W. 863 (1884). Some cases even held that a "conviction, although it be afterwards reversed, is *prima facie* evidence—and that only—of the existence of probable cause." *Neher* v. *Dobbs*, 41 Neb. 863, 868, 66 N. W. 864, 865 (1896) (collecting cases). In *Crescent City Live Stock Co.* v. *Butchers' Union Slaughter-House Co.*, 120 U. S. 141 (1887), we recognized that "[h]ow much weight as proof of probable cause shall be attributed to the judgment of the court in the original action, when subsequently reversed for error, may admit of some question." *Id.*, at 149. We attempted to "reconcile the apparent contradiction in the authorities," *id.*, at 151, by observing that the presumption of probable cause arising from a conviction can be rebutted only by showing that the conviction had been obtained by some type of fraud, *ibid.* Although we ultimately held for the malicious prosecution defendant, our discussion in that case well establishes that the absolute rule JUSTICE SOUTER contends for did not exist.

Yet even if JUSTICE SOUTER were correct in asserting that a prior conviction, although reversed, "dissolved [a] claim for malicious prosecution," *post*, at 496, our analysis would be unaffected. It would simply demonstrate that *no* common-law action, *not even* malicious prosecution, would permit a criminal proceeding to be impugned in a tort action, *even after* the conviction had been reversed. That would, if anything, strengthen our belief that § 1983, which borrowed general tort principles, was not meant to permit such collateral attack.

263 U. S. 413 (1923); *Voorhees* v. *Jackson*, 10 Pet. 449, 472–473 (1836). We think the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution.[5]

We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid,[6] a § 1983 plaintiff must prove

---

[5] JUSTICE SOUTER's discussion of abuse of process, *post*, at 494–495, does not undermine this principle. It is true that favorable termination of prior proceedings is not an element of that cause of action—but neither is an impugning of those proceedings one of its consequences. The gravamen of that tort is not the wrongfulness of the prosecution, but some extortionate perversion of lawfully initiated process to illegitimate ends. See, *e. g., Donohoe Const. Co.* v. *Mount Vernon Associates*, 235 Va. 531, 539–540, 369 S. E. 2d 857, 862 (1988); see also 8 S. Speiser, C. Krause, & A. Gans, American Law of Torts §§ 28:32–28:34 (1991). Cognizable injury for abuse of process is limited to the harm caused by the misuse of process, and does not include harm (such as conviction and confinement) resulting from that process's being carried through to its lawful conclusion. Thus, one could no more seek compensatory damages for an outstanding criminal conviction in an action for abuse of process than in one for malicious prosecution. This limitation is illustrated by *McGann* v. *Allen*, 105 Conn. 177, 191, 134 A. 810, 815 (1926), where the court held that expenses incurred by the plaintiff in defending herself against crimes charged against her were not compensable in a suit for abuse of process, since "[d]amage[s] for abuse of process must be confined to the damage flowing from such abuse, and be confined to the period of time involved in taking plaintiff, after her arrest, to [defendant's] store, and the detention there."

[6] An example of this latter category—a § 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful—would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a *lawful* arrest. (This is a common definition of that offense. See *People* v. *Peacock*, 68 N. Y. 2d 675, 496 N. E. 2d 683 (1986); 4 C. Torcia, Wharton's Criminal Law § 593, p. 307 (14th ed. 1981).) He then brings a § 1983 action against the

that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U. S. C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed,[7] in the absence of some other bar to the suit.[8]

arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. Regardless of the state law concerning res judicata, see n. 2, *supra,* the § 1983 action will not lie.

[7] For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, see *Murray* v. *United States,* 487 U. S. 533, 539 (1988), and especially harmless error, see *Arizona* v. *Fulminante,* 499 U. S. 279, 307–308 (1991), such a § 1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful. In order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, see *Memphis Community School Dist.* v. *Stachura,* 477 U. S. 299, 308 (1986), which, we hold today, does *not* encompass the "injury" of being convicted and imprisoned (until his conviction has been overturned).

[8] For example, if a state criminal defendant brings a federal civil-rights lawsuit during the pendency of his criminal trial, appeal, or state habeas action, abstention may be an appropriate response to the parallel

Respondents had urged us to adopt a rule that was in one respect broader than this: Exhaustion of state remedies should be required, they contended, not just when success in the § 1983 damages suit would necessarily show a conviction or sentence to be unlawful, but whenever "judgment in a § 1983 action would resolve a necessary element to a likely challenge to a conviction, even if the § 1983 court [need] not determine that the conviction is invalid." Brief for Respondents 26, n. 10. Such a broad sweep was needed, respondents contended, lest a judgment in a prisoner's favor in a federal-court § 1983 damages action claiming, for example, a Fourth Amendment violation, be given preclusive effect as to that subissue in a subsequent state-court postconviction proceeding. Preclusion might result, they asserted, if the State exercised sufficient control over the officials' defense in the § 1983 action. See *Montana* v. *United States*, 440 U. S. 147, 154 (1979). While we have no occasion to rule on the matter at this time, it is at least plain that preclusion will not necessarily be an automatic, or even a permissible, effect.[9]

---

state-court proceedings. See *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800 (1976).

Moreover, we do not decide whether abstention might be appropriate in cases where a state prisoner brings a § 1983 damages suit raising an issue that also could be grounds for relief in a state-court challenge to his conviction or sentence. Cf. *Tower* v. *Glover*, 467 U. S. 914, 923 (1984).

[9] State courts are bound to apply federal rules in determining the preclusive effect of federal-court decisions on issues of federal law. See P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1604 (3d ed. 1988) ("It is clear that where the federal court decided a federal question, federal res judicata rules govern"); *Deposit Bank* v. *Frankfort*, 191 U. S. 499, 514–518 (1903); *Stoll* v. *Gottlieb*, 305 U. S. 165, 170–171, 174–175 (1938). The federal rules on the subject of issue and claim preclusion, unlike those relating to exhaustion of state remedies, are "almost entirely judge-made." Hart & Wechsler's, *supra*, at 1598; see also Burbank, Interjurisdictional Preclusion, Full Faith and Credit and Federal Common Law: A General Approach, 71 Cornell L. Rev. 733, 747–778 (1986). And in developing

In another respect, however, our holding sweeps more broadly than the approach respondents had urged. We do not engraft an exhaustion requirement upon § 1983, but rather deny the existence of a cause of action. Even a prisoner who has fully exhausted available state remedies has no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus. That makes it unnecessary for us to address the statute-of-limitations issue wrestled with by the Court of Appeals, which concluded that a federal doctrine of equitable tolling would apply to the § 1983 cause of action while state challenges to the conviction or sentence were being exhausted. (The court distinguished our cases holding that state, not federal, tolling provisions apply in § 1983 actions, see *Board of Regents of Univ. of State of N. Y.* v. *Tomanio,* 446 U. S. 478 (1980); *Hardin* v. *Straub,* 490 U. S. 536 (1989), on the ground that petitioner's claim was "in part one for habeas corpus." 997 F. 2d, at 358.) Under our analysis the statute of limitations poses no difficulty while the state challenges are being pursued, since the § 1983 claim has not yet arisen. Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor, 1 C. Corman, Limitation of Actions § 7.4.1, p. 532 (1991); *Carnes* v. *Atkins Bros. Co.,* 123 La. 26, 31, 48 So. 572, 574 (1909), so also a § 1983 cause of action for damages

them the courts can, and indeed should, be guided by the federal policies reflected in congressional enactments. Cf. *Moragne* v. *States Marine Lines, Inc.,* 398 U. S. 375, 390–391 (1970). See also *United States* v. *Mendoza,* 464 U. S. 154 (1984) (recognizing exception to general principles of res judicata in light of overriding federal policy concerns). Thus, the court-made preclusion rules may, as judicial application of the categorical mandate of § 1983 may *not,* see *Patsy* v. *Board of Regents of Fla.,* 457 U. S. 496, 509 (1982), take account of the policy embodied in § 2254(b)'s exhaustion requirement, see *Rose* v. *Lundy,* 455 U. S. 509 (1982), that state courts be given the first opportunity to review constitutional claims bearing upon state prisoners' release from custody.

attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated.[10]

Applying these principles to the present action, in which both courts below found that the damages claims challenged the legality of the conviction, we find that the dismissal of the action was correct. The judgment of the Court of Appeals for the Seventh Circuit is

*Affirmed.*

JUSTICE THOMAS, concurring.

The Court and JUSTICE SOUTER correctly begin their analyses with the realization that "[t]his case lies at the intersection of . . . the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U. S. C. § 1983, and the federal habeas corpus statute, 28 U. S. C. § 2254." *Ante,* at 480; *post,* at 491. One need only read the respective opinions in this case to under-

---

[10] JUSTICE SOUTER also adopts the common-law principle that one cannot use the device of a civil tort action to challenge the validity of an outstanding criminal conviction, but thinks it necessary to abandon that principle in those cases (of which no real-life example comes to mind) involving former state prisoners who, because they are no longer in custody, cannot bring postconviction challenges. *Post,* at 500. We think the principle barring collateral attacks—a longstanding and deeply rooted feature of both the common law and our own jurisprudence—is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated. JUSTICE SOUTER opines that disallowing a damages suit for a former state prisoner framed by Ku Klux Klan-dominated state officials is "hard indeed to reconcile . . . with the purpose of § 1983." *Post,* at 502. But if, as JUSTICE SOUTER appears to suggest, the goal of our interpretive enterprise under § 1983 were to provide a remedy for all conceivable invasions of federal rights that freedmen may have suffered at the hands of officials of the former States of the Confederacy, the entire landscape of our § 1983 jurisprudence would look very different. We would not, for example, have adopted the rule that judicial officers have absolute immunity from liability for damages under § 1983, *Pierson* v. *Ray,* 386 U. S. 547 (1967), a rule that would prevent recovery by a former slave who had been tried and convicted before a corrupt state judge in league with the Ku Klux Klan.

stand the difficulty of the task before the Court today. Both the Court and JUSTICE SOUTER embark on a similar enterprise—harmonizing "[t]he broad language of § 1983," a "general" statute, with "the specific federal habeas corpus statute." *Preiser* v. *Rodriguez,* 411 U. S. 475, 489 (1973).

I write separately to note that it is we who have put § 1983 and the habeas statute on what JUSTICE SOUTER appropriately terms a "collision course." *Post,* at 492. It has long been recognized that we have expanded the prerogative writ of habeas corpus and § 1983 far beyond the limited scope either was originally intended to have. Cf., *e. g., Wright* v. *West,* 505 U. S. 277, 285–286 (1992) (opinion of THOMAS, J.) (habeas); *Golden State Transit Corp.* v. *Los Angeles,* 493 U. S. 103, 117 (1989) (KENNEDY, J., dissenting) (§ 1983). Expanding the two historic statutes brought them squarely into conflict in the context of suits by state prisoners, as we made clear in *Preiser.*

Given that the Court created the tension between the two statutes, it is proper for the Court to devise limitations aimed at ameliorating the conflict, provided that it does so in a principled fashion. Cf. *Malley* v. *Briggs,* 475 U. S. 335, 342 (1986). Because the Court today limits the scope of § 1983 in a manner consistent both with the federalism concerns undergirding the explicit exhaustion requirement of the habeas statute, *ante,* at 483, and with the state of the common law at the time § 1983 was enacted, *ante,* at 484–486, and n. 4, I join the Court's opinion.

JUSTICE SOUTER, with whom JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE O'CONNOR join, concurring in the judgment.

The Court begins its analysis as I would, by observing that "[t]his case lies at the intersection of the two most fertile sources of federal-court prisoner litigation—the Civil Rights Act of 1871, . . . 42 U. S. C. § 1983, and the federal habeas corpus statute, 28 U. S. C. § 2254," two statutes that

"provide access to a federal forum for claims of unconstitutional treatment at the hands of state officials," while "differ[ing] in their scope and operation." *Ante*, at 480. But instead of analyzing the statutes to determine which should yield to the other at this intersection, the Court appears to take the position that the statutes were never on a collision course in the first place because, like the common-law tort of malicious prosecution, § 1983 requires (and, presumably, has always required) plaintiffs seeking damages for unconstitutional conviction or confinement to show the favorable termination of the underlying proceeding. See *ante*, at 484–487.

While I do not object to referring to the common law when resolving the question this case presents, I do not think that the existence of the tort of malicious prosecution alone provides the answer. Common-law tort rules can provide a "starting point for the inquiry under § 1983," *Carey* v. *Piphus*, 435 U. S. 247, 258 (1978), but we have relied on the common law in § 1983 cases only when doing so was thought to be consistent with ordinary rules of statutory construction, as when common-law principles have textual support in other provisions of the Civil Rights Act of 1871, see, *e. g., id.*, at 255–256 (damages under § 1983), or when those principles were so fundamental and widely understood at the time § 1983 was enacted that the 42d Congress could not be presumed to have abrogated them silently, see, *e. g., Tenney* v. *Brandhove*, 341 U. S. 367, 376 (1951) (immunity under § 1983); *Pierson* v. *Ray*, 386 U. S. 547, 553–554 (1967) (same). At the same time, we have consistently refused to allow common-law analogies to displace statutory analysis, declining to import even well-settled common-law rules into § 1983 "if [the statute's] history or purpose counsel against applying [such rules] in § 1983 actions." *Wyatt* v. *Cole*, 504 U. S. 158, 164 (1992); see also *Tower* v. *Glover*, 467 U. S. 914, 920–921 (1984). Cf. *Anderson* v. *Creighton*, 483 U. S. 635, 645 (1987) ("[W]e have never suggested that the precise contours of official im

munity [under § 1983] can and should be slavishly derived from the often arcane rules of the common law").[1]

An examination of common-law sources arguably relevant in this case confirms the soundness of our hierarchy of principles for resolving questions concerning § 1983. If the common law were not merely a "starting point" for the analysis under § 1983, but its destination, then (unless we were to have some authority to choose common-law requirements we like and discard the others) principle would compel us to accept as elements of the § 1983 cause of action not only the malicious-prosecution tort's favorable-termination requirement, but other elements of the tort that cannot coherently be transplanted. In addition to proving favorable termina-

---

[1] Our recent opinion in *Wyatt* v. *Cole,* 504 U. S. 158 (1992), summarized the manner in which the Court has analyzed the relationship between the common law and § 1983 in the context of immunity:

"Section 1983 'creates a species of tort liability that on its face admits of no immunities.' *Imbler* v. *Pachtman,* 424 U. S. 409, 417 (1976). Nonetheless, we have accorded certain government officials either absolute or qualified immunity from suit if the 'tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that "Congress would have specifically so provided had it wished to abolish the doctrine."' *Owen* v. *City of Independence,* 445 U. S. 622, 637 (1980) (quoting *Pierson* v. *Ray,* 386 U. S. 547, 555 (1967)). If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871—§ 1 of which is codified at 42 U. S. C. § 1983—we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law. See *Tower* v. *Glover,* 467 U. S. 914, 920 (1984); *Imbler, supra,* at 421; *Pulliam* v. *Allen,* 466 U. S. 522, 529 (1984). Additionally, irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions. *Tower, supra,* at 920. See also *Imbler, supra,* at 424–429." *Id.,* at 163–164.

In his concurrence, JUSTICE KENNEDY stated: "It must be remembered that unlike the common-law judges whose doctrines we adopt, we are devising limitations to a remedial statute, enacted by the Congress, which 'on its face does not provide for *any* immunities.'" *Id.,* at 171 (quoting *Malley* v. *Briggs,* 475 U. S. 335, 342 (1986)) (emphasis added in *Malley*).

tion, a plaintiff in a malicious-prosecution action, according to the same sources the Court relies upon, must prove the "[a]bsence of probable cause for the proceeding" as well as " '[m]alice,' or a primary purpose other than that of bringing an offender to justice." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 871 (5th ed. 1984) (hereinafter Prosser and Keeton); see also 8 S. Speiser, C. Krause, & A. Gans, American Law of Torts § 28:7, p. 38, § 28:11, p. 61 (1991). As § 1983 requirements, however, these elements would mean that even a § 1983 plaintiff whose conviction was invalidated as unconstitutional (premised, for example, on a confession coerced by an interrogation-room beating) could not obtain damages for the unconstitutional conviction and ensuing confinement if the defendant police officials (or perhaps the prosecutor) had probable cause to believe the plaintiff was guilty and intended to bring him to justice. Absent an independent statutory basis for doing so, importing into § 1983 the malicious-prosecution tort's favorable-termination requirement but not its probable-cause requirement would be particularly odd since it is from the latter that the former derives. See Prosser and Keeton 874 ("The requirement that the criminal prosecution terminate in favor of the malicious prosecution plaintiff . . . is primarily important not as an independent element of the malicious prosecution action but only for what it shows about probable cause or guilt-in-fact"); M. Bigelow, Leading Cases on Law of Torts 196 (1875) ("The action for a malicious prosecution cannot be maintained until the prosecution has terminated; for otherwise the plaintiff might obtain judgment in the one case and yet be convicted in the other, which would of course disprove the averment of a want of probable cause").

If, in addition, the common law were the master of statutory analysis, not the servant (to switch metaphors), we would find ourselves with two masters to contend with here, for we would be subject not only to the tort of malicious

prosecution but to the tort of abuse of process as well, see *Wyatt* v. *Cole, supra,* at 164 (calling these two actions "the most closely analogous torts" to §1983), the latter making it "unnecessary for the plaintiff to prove that the proceeding has terminated in his favor," Prosser and Keeton 897. The Court suggests that the tort of malicious prosecution provides "the closest analogy to claims of the type considered here" because "it permits damages for confinement imposed pursuant to legal process." *Ante,* at 484. But the same appears to be true for the tort of abuse of process. See Restatement (Second) of Torts §682, Illustration 1 (1977) (indicating that a person who, by causing a court to issue a writ of capias against someone to whom he lent money, caused the borrower to be "arrested . . . and kept in prison" is properly held liable for the arrest and imprisonment if the lender's purpose in using legal process was wrongful (and regardless of favorable termination or want of probable cause)).[2]

Furthermore, even if the tort of malicious prosecution were today marginally more analogous than other torts to the type of §1983 claim in the class of cases before us (because it alone may permit damages for unlawful conviction or postconviction confinement, see n. 3, *infra*), the Court overlooks a significant historical incongruity that calls into question the utility of the analogy to the tort of malicious

---

[2] As the Court observes, there are differences between the tort of abuse of process and that of malicious prosecution. *Ante,* at 486, n. 5. While "the gist of the tort [of malicious prosecution] is . . . . commencing an action or causing process to issue without justification," abuse of process involves "misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish." Prosser and Keeton 897. Neither common-law tort, however, precisely matches the statutory §1983 claim for damages for unlawful conviction or confinement; and, depending on the nature of the underlying right alleged to have been violated (consider, for example, the right not to be selected for prosecution solely because of one's race), the tort of abuse of process might provide a better analogy to a §1983 claim for unconstitutional conviction or confinement than the malicious-prosecution tort.

prosecution insofar as it is used exclusively to determine the scope of § 1983: the damages sought in the type of § 1983 claim involved here, damages for unlawful conviction or post-conviction confinement, were not available at all in an action for malicious prosecution at the time of § 1983's enactment. A defendant's conviction, under Reconstruction-era common law, dissolved his claim for malicious prosecution because the conviction was regarded as irrebuttable evidence that the prosecution never lacked probable cause. See T. Cooley, Law of Torts 185 (1879) ("If the defendant is convicted in the first instance and appeals, and is acquitted in the appellate court, the conviction below is conclusive of probable cause"). Thus the definition of "favorable termination" with which the framers of § 1983 were aware (if they were aware of any definition) included none of the events relevant to the type of § 1983 claim involved in this case ("revers[al] on direct appeal, expunge[ment] by executive order, [a] declar[ation] [of] invalid[ity] by a state tribunal authorized to make such determination, or [the] call[ing] into question by a federal court's issuance of a writ of habeas corpus," *ante*, at 487), and it is easy to see why the analogy to the tort of malicious prosecution in this context has escaped the collective wisdom of the many courts and commentators to have addressed the issue previously, as well as the parties to this case. Indeed, relying on the tort of malicious prosecution to dictate the outcome of this case would logically drive one to the position, untenable as a matter of statutory interpretation (and, to be clear, disclaimed by the Court), that conviction of a crime wipes out a person's § 1983 claim for damages for unconstitutional conviction or postconviction confinement.[3]

---

[3] Some of the traditional common-law requirements appear to have liberalized over the years, see Prosser and Keeton 882 ("There is a considerable minority view which regards the conviction as creating only a presumption, which may be rebutted by any competent evidence showing that probable cause for the prosecution did not in fact exist"), strengthening the analogy the Court draws. But surely the Court is not of the view

We are not, however, in any such strait, for our enquiry in this case may follow the interpretive methodology employed in *Preiser* v. *Rodriguez*, 411 U. S. 475 (1973) (a methodology uniformly applied by the Courts of Appeals in analyzing analogous cases, see, *e. g., Young* v. *Kenny*, 907 F. 2d 874, 875–876 (CA9 1990)). In *Preiser*, we read the "general" § 1983 statute in light of the "specific federal habeas corpus statute," which applies only to "person[s] in custody," 28 U. S. C. § 2254(a), and the habeas statute's policy, embodied in its exhaustion requirement, § 2254(b), that state courts be given the first opportunity to review constitutional claims bearing upon a state prisoner's release from custody. 411 U. S., at 489. Though in contrast to *Preiser* the state prisoner here seeks damages, not release from custody, the distinction makes no difference when the damages sought are for unconstitutional conviction or confinement. (As the Court explains, nothing in *Preiser* nor in *Wolff* v. *McDonnell*, 418 U. S. 539 (1974), is properly read as holding that the relief sought in a § 1983 action dictates whether a state prisoner can proceed immediately to federal court. See *ante*,

---

that a single tort in its late 20th-century form can conclusively (and retroactively) dictate the requirements of a 19th-century statute for a discrete category of cases. Defending the historical analogy, the Court suggests that Chief Justice Cooley did not mean what he clearly said and that, despite the Cooley treatise, the Reconstruction-era common law recognized a limited exception to the rule denying a malicious-prosecution plaintiff the benefit of the invalidation of his conviction: an exception for convictions "obtained by some type of fraud." *Ante*, at 485, n. 4 (citing *Crescent City Live Stock Co.* v. *Butchers' Union Slaughter-House Co.*, 120 U. S. 141, 151 (1887)). Even if such a narrow exception existed, however, the tort of malicious prosecution as it stood during the mid-19th century would still make for a weak analogy to a statutory action under which, as even the Court accepts, defendants whose convictions were reversed as violating "any righ[t] . . . secured by the Constitution," 42 U. S. C. § 1983, may obtain damages for the unlawful confinement associated with the conviction (assuming, of course, no immunity bar). Nor, of course, would the existence of such an exception explain how one element of a malicious-prosecution action may be imported into § 1983, but not the others.

at 481–483.) Whether or not a federal-court § 1983 damages judgment against state officials in such an action would have preclusive effect in later litigation against the State, mounting damages against the defendant-officials for unlawful confinement (damages almost certainly to be paid by state indemnification) would, practically, compel the State to release the prisoner. Because allowing a state prisoner to proceed directly with a federal-court § 1983 attack on his conviction or sentence "would wholly frustrate explicit congressional intent" as declared in the habeas exhaustion requirement, *Preiser*, 411 U. S., at 489, the statutory scheme must be read as precluding such attacks. This conclusion flows not from a preference about how the habeas and § 1983 statutes ought to have been written, but from a recognition that "Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, [a] specific determination [that] must override the general terms of § 1983." *Id.*, at 490.

That leaves the question of how to implement what statutory analysis requires. It is at this point that the malicious-prosecution tort's favorable-termination requirement becomes helpful, not in dictating the elements of a § 1983 cause of action, but in suggesting a relatively simple way to avoid collisions at the intersection of habeas and § 1983. A state prisoner may seek federal-court § 1983 damages for unconstitutional conviction or confinement, but only if he has previously established the unlawfulness of his conviction or confinement, as on appeal or on habeas. This has the effect of requiring a state prisoner challenging the lawfulness of his confinement to follow habeas's rules before seeking § 1983 damages for unlawful confinement in federal court, and it is ultimately the Court's holding today. It neatly resolves a problem that has bedeviled lower courts, see 997 F. 2d 355, 357–358 (CA7 1993) (decision below); *Young* v. *Kenny*, *supra*, at 877 (discussing cases), legal commentators, see Schwartz, The *Preiser* Puzzle, 37 DePaul L. Rev. 85, 86–87, n. 6 (1988)

(listing articles), and law students (some of whom doubtless have run up against a case like this in law-school exams). The favorable-termination requirement avoids the knotty statute-of-limitations problem that arises if federal courts dismiss § 1983 suits filed before an inmate pursues federal habeas, and (because the statute-of-limitations clock does not start ticking until an inmate's conviction is set aside) it does so without requiring federal courts to stay, and therefore to retain on their dockets, prematurely filed § 1983 suits. See *ante*, at 489.[4]

It may be that the Court's analysis takes it no further than I would thus go, and that any objection I may have to the Court's opinion is to style, not substance. The Court acknowledges the habeas exhaustion requirement and explains that it is the reason that the habeas statute "intersect[s]"

---

[4] The requirement that a state prisoner seeking § 1983 damages for unlawful conviction or confinement be successful in state court or on federal habeas strikes me as soundly rooted in the statutory scheme. Because "Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, [a] specific determination [that] override[s] the general terms of § 1983," *Preiser* v. *Rodriguez*, 411 U. S. 475, 490 (1973), a state prisoner whose constitutional attacks on his confinement have been rejected by state courts cannot be said to be unlawfully confined unless a federal habeas court declares his "custody [to be] in violation of the Constitution or laws or treaties of the United States," 28 U. S. C. § 2254(a). An unsuccessful federal habeas petitioner cannot, therefore, consistently with the habeas statute, receive § 1983 damages for unlawful confinement. That is not to say, however, that a state prisoner whose request for release has been (or would be) rejected by state courts or by a federal habeas court is necessarily barred from seeking any § 1983 damages for violations of his constitutional rights. If a § 1983 judgment in his favor would not demonstrate the invalidity of his confinement he is outside the habeas statute and may seek damages for a constitutional violation even without showing "favorable termination." A state prisoner may, for example, seek damages for an unreasonable search that produced evidence lawfully or harmlessly admitted at trial, or even nominal damages for, say, a violation of his right to procedural due process, see *Carey* v. *Piphus*, 435 U. S. 247, 266 (1978). See *ante*, at 487, and n. 7.

in this case with § 1983, which does not require exhaustion, see *ante*, at 480; it describes the issue it faces as "the same" as that in *Preiser, ante,* at 483; it recites the principle that common-law tort rules "'provide the appropriate starting point for the inquiry under § 1983,'" *ibid.* (quoting *Carey* v. *Piphus,* 435 U. S., at 257–258); and it does not transpose onto § 1983 elements of the malicious-prosecution tort that are incompatible with the policies of § 1983 and the habeas statute as relevant to claims by state prisoners. The Court's opinion can be read as saying nothing more than that now, after enactment of the habeas statute and because of it, prison inmates seeking § 1983 damages in federal court for unconstitutional conviction or confinement must satisfy a requirement analogous to the malicious-prosecution tort's favorable-termination requirement. Cf. *ante,* at 491 (THOMAS, J., concurring).

That would be a sensible way to read the opinion, in part because the alternative would needlessly place at risk the rights of those outside the intersection of § 1983 and the habeas statute, individuals not "in custody" for habeas purposes. If these individuals (people who were merely fined, for example, or who have completed short terms of imprisonment, probation, or parole, or who discover (through no fault of their own) a constitutional violation after full expiration of their sentences), like state prisoners, were required to show the prior invalidation of their convictions or sentences in order to obtain § 1983 damages for unconstitutional conviction or imprisonment, the result would be to deny any federal forum for claiming a deprivation of federal rights to those who cannot first obtain a favorable state ruling. The reason, of course, is that individuals not "in custody" cannot invoke federal habeas jurisdiction, the only statutory mechanism besides § 1983 by which individuals may sue state officials in federal court for violating federal rights. That would be an untoward result.

It is one thing to adopt a rule that forces prison inmates to follow the federal habeas route with claims that fall within the plain language of § 1983 when that is necessary to prevent a requirement of the habeas statute from being undermined. That is what the Court did in *Preiser* v. *Rodriguez*, 411 U. S., at 489–492, and that is what the Court's rule would do for state prisoners. Harmonizing § 1983 and the habeas statute by requiring a state prisoner seeking damages for unconstitutional conviction to establish the previous invalidation of his conviction does not run afoul of what we have called, repeatedly, "[t]he very purpose of" § 1983: "to interpose the federal courts between the States and the people, as guardians of the people's federal rights." *Mitchum* v. *Foster*, 407 U. S. 225, 242 (1972); see also *Pulliam* v. *Allen*, 466 U. S. 522, 541 (1984); *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 503 (1982). A prisoner caught at the intersection of § 1983 and the habeas statute can still have his attack on the lawfulness of his conviction or confinement heard in federal court, albeit one sitting as a habeas court; and, depending on the circumstances, he may be able to obtain § 1983 damages.

It would be an entirely different matter, however, to shut off federal courts altogether to claims that fall within the plain language of § 1983. "[I]rrespective of the common law support" for a general rule disfavoring collateral attacks, the Court lacks the authority to do any such thing absent unambiguous congressional direction where, as here, reading § 1983 to exclude claims from federal court would run counter to "§ 1983's history" and defeat the statute's "purpose." *Wyatt* v. *Cole*, 504 U. S., at 158. Consider the case of a former slave framed by Ku Klux Klan-controlled law-enforcement officers and convicted by a Klan-controlled state court of, for example, raping a white woman; and suppose that the unjustly convicted defendant did not (and could not) discover the proof of unconstitutionality until after his

release from state custody. If it were correct to say that § 1983 independently requires a person not in custody to establish the prior invalidation of his conviction, it would have been equally right to tell the former slave that he could not seek federal relief even against the law-enforcement officers who framed him unless he first managed to convince the state courts that his conviction was unlawful. That would be a result hard indeed to reconcile either with the purpose of § 1983 or with the origins of what was "popularly known as the Ku Klux Act," *Collins* v. *Hardyman,* 341 U. S. 651, 657 (1951), the statute having been enacted in part out of concern that many state courts were "in league with those who were bent upon abrogation of federally protected rights," *Mitchum* v. *Foster, supra,* at 240; cf. Cong. Globe, 42d Cong., 1st Sess., 577 (1871) (Sen. Trumbull explaining that, under the Civil Rights Act of 1871, "the Federal Government has a right to set aside . . . action of the State authorities" that deprives a person of his Fourteenth Amendment rights). It would also be a result unjustified by the habeas statute or any other post-§ 1983 enactment.

Nor do I see any policy reflected in a congressional enactment that would justify denying to an individual today federal damages (a significantly less disruptive remedy than an order compelling release from custody) merely because he was unconstitutionally fined by a State, or to a person who discovers after his release from prison that, for example, state officials deliberately withheld exculpatory material. And absent such a statutory policy, surely the common law can give us no authority to narrow the "broad language" of § 1983, which speaks of deprivations of "any" constitutional rights, privileges, or immunities, by "[e]very" person acting under color of state law, and to which "we have given full effect [by] recognizing that § 1983 'provide[s] a remedy, to be broadly construed, against all forms of official violation of federally protected rights.'" *Dennis* v. *Higgins,* 498 U. S. 439, 443, 445 (1991) (quoting *Monell* v. *New York City Dept. of Social Servs.,* 436 U. S. 658, 700–701 (1978)).

In sum, while the malicious-prosecution analogy provides a useful mechanism for implementing what statutory analysis requires, congressional policy as reflected in enacted statutes must ultimately be the guide. I would thus be clear that the proper resolution of this case (involving, of course, a state prisoner) is to construe § 1983 in light of the habeas statute and its explicit policy of exhaustion. I would not cast doubt on the ability of an individual unaffected by the habeas statute to take advantage of the broad reach of § 1983.