Dayutis v. Brodeur, et al.          CV-96-156-B    06/23/99

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Dean Dayutis

v.                                    Civil No. 96-156-B

**Paul Brodeur, et al.**


**MEMORANDUM AND ORDER**


Dean Dayutis brings this three-count complaint pursuant to 42 U.S.C. § 1983.  Dayutis seeks compensatory and punitive damages from the 18 Defendants, various New Hampshire State Prison employees, Department of Corrections officials, and New Hampshire Adult Parole Board members.  He argues that the defendants unconstitutionally deprived him of good time credits during his incarceration, denied him parole in violation of his right to due process of law, and transferred him to a prison facility in Connecticut in retaliation for engaging in conduct protected by the First Amendment.  Defendants have moved for summary judgment as to all of Dayutis' claims.  For the reasons explained below, I grant defendants' motion.

## I.  FACTS

Dayutis is a former New Hampshire State Prison inmate.  In 1983, he was convicted of second-degree murder and received an 18-to-40-year prison sentence.  The New Hampshire Parole Board granted Dayutis parole in August 1998.  Dayutis filed the present action in 1996, while still incarcerated pursuant to his murder conviction.[1]

Dayutis' stay in the New Hampshire prison system was not trouble-free.  Prison officials cited Dayutis for numerous disciplinary violations, which resulted in his loss of 385 days of good time credits between 1988 and 1992.  The loss of good time credits, in turn, delayed Dayutis' earliest date of parole eligibility.

Dayutis alleges that the prison disciplinary policy prior to July 1992 was rife with discrimination, leading to "inconsistent and arbitrary punishment . . . handed out at the whim of officials."  Violations warranting "major hearings" were punishable by loss of good time credit, while "minor" violations

---

[1]  Dayutis' amended complaint also sought various forms of declaratory and injunctive relief.  Because Dayutis was subsequently released on parole, I dismissed his claims for declaratory and injunctive relief as moot.  See Dayutis v. Brodeur, et al., CV-96-156-B, (D.N.H. August 27, 1998)(Endorsed Order).

were not.  See Aff. of John Vinson at ¶4(a), pp. 13-15 (N.H. Dept. of Corrections Policy & Procedure Directive, Effective 2/3/92).  He claims that prison officials had discretion under the policy to decide whether a prisoner's alleged violation was "minor" or "major."  See id. at 20.

In July 1992, a new policy went into effect.  See Vinson Aff. at ¶4(b), p. 24 (N.H. Dept. of Corrections Policy & Procedure Directive, Effective 7/23/92).  As with the prior policy, prison officials had discretion to determine the severity of a violation.  Only "major" violations warranted loss of good time credits.  The new policy, however, created three categories of rules and set maximum penalties for each category.  See id. at 42-46.  For example, under the prior policy, a "major" violation could result in a prisoner's loss of up to 100 days of good time credit.  See id. at ¶4(a), pp. 14-15.  Under the new policy, a "major" violation was subject to a maximum of either 100, 25 or 10 lost days, depending on the category of rule the prisoner violated.  See id. at ¶4(b), p. 42.  Some of Dayutis' pre-July 1992 violations, if prosecuted under the revised policy, would have subjected him to more lenient penalties and fewer lost

days.[2]

The New Hampshire State Prison houses inmates according to a discipline-based classification system. Custody levels range from C-1 to C-5, with C-5 as the highest level of security. From August 1992 to June 1993, Dayutis was classified at level C-4 and was housed in the maximum-security Special Housing Unit (SHU). Prison officials ordered Dayutis moved to the maximum-security Close Custody Unit (CCU). Defendants claim that Dayutis refused to be moved to CCU on several occasions.

Dayutis engaged in much litigation against prison officials during his stay in New Hampshire, both on his behalf and on behalf of fellow prisoners. He filed several petitions for a writ of habeas corpus in both state and federal court, all of which were denied. He also appeared as a witness in proceedings brought by another inmate against Corrections Officer Richard

---

[2] Dayutis rarely lost the maximum number of good time days under either policy. For example, according to the Offender Record Face Sheet submitted by Defendants, Dayutis lost 100 days of good time on February 27, 1991, for two violations: encouraging a work stoppage and participating in "conduct which disrupts or interferes with the security or orderly operation of the institution." See Vinson Aff. at ¶4(n), p. 219. Under the policy in effect at that time, Dayutis could have lost up to 200 days of good time - 100 for each violation. Under the revised policy, Dayutis could have lost a maximum of 125 days for the violations - 100 for the "Class A" violation (encouraging a work stoppage) and 25 for the "Class B" violation (conduct which disrupts).

-4-

Parrish, one of the defendants in this action. Dayutis claims that as a result of his litigation activity, he was subjected to a cell search on April 6, 1993, during which prison officials wrongfully confiscated 1,500 pages of legal documents. Several days later, Dayutis was notified that a discipline report had been filed, alleging he had possession of other prisoner's papers.

On April 19, 1993, Dayutis was brought before three of the Defendants for a transfer hearing. Defendants Gregg Crompton, a classification officer; Michael Sukolow, SHU manager; and David Martinelli, a SHU corrections officer; voted to transfer Dayutis to an out-of-state facility. Dayutis claims that the transfer was in retaliation for his litigation activities. Defendants, however, claim that Dayutis was transferred because of his numerous refusals to move from SHU to CCU. Dayutis was transferred to a Connecticut facility on June 1, 1993, where he continued as a C-4 status prisoner.

While Dayutis was housed in Connecticut, the New Hampshire prison classification board lowered his status to C-3. Although he was eligible for parole on June 5, 1994, the Parole Board denied his requests for parole on several occasions. See Vinson Aff. at ¶4(n), p. 217. Dayutis claims that he was denied parole

because he was classified at C-3 status, rather than minimum-security C-2 or C-1 status. Dayutis was not eligible for a lower custody status, however, while he remained at the Connecticut facility. An April 1997 letter to Dayutis from Defendant John F. Eckert, Executive Assistant to the Parole Board, states:

> You will have another hearing when you do what the board told you at your last hearing: attain C-2, or minimum custody status. We realize that Connecticut classification rules prevent you from reaching that status any time soon. Therefore, I suggest that you request a transfer to Massachusetts. Not only will that place you closer to your family, but it may very well enable you to reach C-2 - and therefore qualify for another hearing - sooner than if you remain in Connecticut.

See Pl.'s Obj. to Defs.' Motion for Summary Judgment and attachments (document no. 54). New Hampshire prison officials offered to seek a transfer to a Massachusetts facility, but Dayutis refused.[3] Instead, he continued to press for a return to New Hampshire and a reduction to C-2 status. Dayutis remained incarcerated in Connecticut until March 1998, when he was returned to the New Hampshire State Prison. He was reclassified

___

[3] Dayutis claims that a transfer to Massachusetts would have been pointless, as Massachusetts rules forbid "second-degree lifers" from moving to minimum security facilities. See Pl.'s Obj. to Defs.' Motion for Summary Judgment and attachments. Dayutis, however, is not a "second-degree lifer." While convicted of second-degree murder, he did not receive a life sentence. Thus, it is not clear that Massachusetts would have refused to classify Dayutis as a minimum-security prisoner.

at the C-2 level and was paroled in August 1998.

Dayutis alleges violations of his Fourteenth Amendment right to procedural due process in connection with both the prison disciplinary proceedings leading to the loss of his good time credit and the parole board's decision to initially deny him parole. He also claims that the Defendants violated his First Amendment rights by transferring him to an out-of-state prison in retaliation for filing lawsuits against prison officials and helping other inmates do the same. The defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56(c). Dayutis objects.

## II. **STANDARD**

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Lehman v. Prudential Ins. Co. of America, 74 F.3d 323, 327 (1st Cir. 1996). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] . . . may reasonably be resolved in favor of either party." Anderson v.

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  A material fact is one that affects the outcome of the suit.  <u>See</u> <u>id.</u> at 248.  In ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-movant and determine whether the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Oliver v. Digital Equipment Corp.</u>, 846 F.2d 103, 105 (1st Cir. 1988).  I apply these standards to the issues the parties raise here.

## III.  <u>DISCUSSION</u>

Dayutis sets forth three claims alleging violations of his constitutional rights.[4]  Count I of his complaint alleges that his loss of good time credits pursuant to pre-July 1992 disciplinary actions violated his Fourteenth Amendment right to due process of law.  Count II also alleges a due process violation, claiming that his custody status was an improper

---

[4]  Dayutis' amended complaint also contained an ex post facto claim, based on the alleged application of "retrospective regulations" to determine his parole eligibility; an equal protection claim, also based on the application of those regulations; and a "court access claim," alleging that he was deprived of his right to petition the government for relief for his alleged injuries.  Dayutis was denied leave to amend his complaint to pursue those claims.  <u>See</u> <u>Dayutis v. Brodeur</u>, CV-96-156-B (D.N.H. December 17, 1997)(Order of Magistrate Judge James R. Muirhead).

prerequisite for attaining parole.[5] Finally, Count III alleges that Defendants transferred Dayutis to Connecticut in retaliation for exercising his First Amendment rights by filing lawsuits against prison officials and for helping other inmates do the same. Because Dayutis could not attain C-2 custody status while in Connecticut, he alleges that the "retaliatory transfer" prevented him from gaining parole from his minimum eligibility date of June 5, 1994, to the date of his return to New Hampshire in March 1998. Defendants argue that Dayutis' two procedural due process claims are barred by the doctrine set forth by the United States Supreme Court in Heck v. Humphrey, 512 U.S. 477 (1994). As to Dayutis' retaliatory transfer claim, Defendants argue that it is barred by the statute of limitations.[6]

---

[5] Dayutis actually claims that he was denied parole eligibility based upon his custody status. As the Defendants point out, parole eligibility is governed by the New Hampshire Adult Parole Board Rules, which state that a prisoner is "eligible for parole at any time between the minimum release date and the end of his term of incarceration as set in his original sentence." See Vinson Aff. at ¶4(f), p. 123. Thus, Dayutis was eligible for parole once his minium release date came and went. I will construe Count II to allege that the Board improperly denied Dayutis parole, rather than parole eligibility, based upon his failure to attain C-2 custody status. To the extent Dayutis argues that his parole eligibility was delayed by pre-July 1992 disciplinary actions, I address his argument in the discussion regarding Count I of his complaint.

[6] Defendants have moved for summary judgment on numerous grounds. Because I find that Dayutis' due process claims are

**A.** **Dayutis is barred from litigating his procedural**
**due process claims based upon pre-July 1992 disciplinary**
**proceedings.**

Where a state prisoner seeks damages pursuant to § 1983, the
Supreme Court instructs me to consider whether a judgment in his
favor would imply the invalidity of his conviction or sentence.
See Heck, 512 U.S. at 487.  If so, I must dismiss the complaint
unless the plaintiff demonstrates that the conviction or sentence
has been invalidated.  See id.

> In order to recover damages for allegedly
> unconstitutional conviction or imprisonment, or for
> other harm caused by actions whose unlawfulness would
> render a conviction or sentence invalid, a § 1983
> plaintiff must prove that the conviction or sentence
> has been reversed on direct appeal, expunged by
> executive order, declared invalid by a state tribunal
> authorized to make such determination, or called into
> question by a federal court's issuance of a writ of
> habeas corpus.

Id. at 486-87.  The Heck rule applies with equal force to a §
1983 claim challenging the disciplinary procedures used to
deprive an inmate of good time credits, as a decision in his
favor would necessarily imply the invalidity of his continued
imprisonment.  See Edwards v. Balisok, 520 U.S. 641, 648 (1997);
Heck, 512 U.S. at 481.  Such is the case here, where Dayutis

---

barred by the Heck doctrine and that his retaliation claim is
time-barred, I do not address the parties' remaining arguments in
this Order.

-10-

would have me declare the pre-July 1992 disciplinary proceedings unconstitutional. To do so would necessarily imply the invalidity of his imprisonment, as a finding in his favor would invalidate his loss of good time credits and, accordingly, his delayed minimum date for parole eligibility. See id. at 645-48; Heck, 512 U.S. at 486-87 (1994). See also White v. Gittens, 121 F.3d 803, 806-07 (1st Cir. 1997). Thus, unless Dayutis can show that the pre-July 1992 rulings depriving him of good time credits have been invalidated, I must dismiss Count I of his complaint.[7] See Heck, 512 U.S. at 481.

Dayutis is unable to show that the pre-July 1992 rulings he now seeks to challenge have been invalidated by the issuance of a writ of habeas corpus or any other action. While he did petition both the state court and this Court for a writ of habeas corpus on several occasions, he did not seek relief based on the alleged deprivations set forth in his amended complaint. Thus, no court has invalidated those procedures as they were applied to Dayutis.[8]

---

[7] The rule announced in Heck also applies to cases in which a defendant cannot seek habeas corpus relief because he has completed his sentence. Heck, 512 at 490 n.10.

[8] I previously denied Dayutis' petition for a writ of habeas corpus, finding that the procedures employed to adjudicate his disciplinary violations were constitutionally adequate. See Dayutis v. Powell, CV-93-257-B (D.N.H. May 2, 1994)(Order). Although Dayutis' prior claim differed from the claims set forth

Dayutis also fails to produce evidence that any court has invalidated the pre-July 1992 policy and procedure on its face. The mere fact that the Department of Corrections amended its disciplinary Policy & Procedure Directive does not establish that the prior Directive was constitutionally defective.

Because I find that Heck bars Dayutis from litigating his procedural due process claim based on the pre-July 1992 disciplinary policy and procedures, Defendants are entitled to summary judgment on Count I of Dayutis' complaint.

**B.    Dayutis is barred from litigating his procedural due process claims based upon the Parole Board's consideration of his custody status in denying parole.**

Dayutis sought a writ of habeas corpus in state court based upon the Parole Board's consideration of his custody status despite his inability to achieve C-2 status in Connecticut. See Dayutis v. Brodeur, 96-E-0026, Merrimack County Superior Court. Presiding Justice Arthur D. Brennan denied Dayutis' petition on March 14, 1996. Dayutis' motion for reconsideration was denied on May 6, 1996. Dayutis apparently did not pursue any appeal. Nor did he petition this Court for a writ of habeas corpus on these grounds. Thus, Dayutis has failed to show that the Board's

in this action, the challenged actions were taken pursuant to pre-July 1992 disciplinary policy and procedures.

policy has been invalidated by court order or otherwise. Quite the opposite is true, as the Merrimack County Superior Court found Dayutis' claim to be without merit. Thus, as with Count I, I find that Count II is barred by the Heck rule as a decision in Dayutis' favor would necessarily call into question the validity of the Board's action. See Heck, 512 U.S. at 486-87; White, 121 F.3d at 806-07 ("[plaintiff's] § 1983 action is not cognizable since any award of damages or declaratory relief would obviously call into question the as yet undisturbed validity of the state parole board's action"). See also Schafer v. Moore, 46 F.3d 43, 45 (8th Cir. 1995)(applying Heck to bar state prisoner's § 1983 lawsuit challenging denial of parole). As such, Defendants are entitled to summary judgment on Count II of Dayutis' complaint.

C.    **The 3-year statute of limitations bars Dayutis from litigating his retaliatory transfer claim.**

Dayutis stated his retaliatory transfer claim for the first time in an amended complaint filed on June 9, 1997. Defendants point to the fact that Dayutis was transferred to Connecticut on June 1, 1993 and argue that his claim is barred by New Hampshire's three-year statute of limitations. Dayutis disagrees, arguing that his claim "relates back" to the date of his original complaint which he filed within the limitations period. Additionally, he claims that because his incarceration

-13-

in Connecticut constitutes a "continuing wrong," his action did not accrue until he was transferred back to New Hampshire on or about March 5, 1998. For the reasons set forth below, I reject Dayutis' arguments and find that his retaliatory transfer claim is time-barred.[9]

### 1. Dayutis' retaliatory transfer claim does not relate back to the date of his original complaint.

In the context of a constitutional tort claim brought pursuant to § 1983, I must apply New Hampshire's statute of limitations for personal injury actions. See Street v. Vose, 936 F.2d 38, 39 (1st Cir. 1991)(citing Wilson v. Garcia, 471 U.S. 261, 276-80 (1985))(federal courts must borrow statute of limitations applicable to personal injury actions under law of forum state). In New Hampshire, the applicable limitations period is three years. See N.H. Rev. Stat. Ann. § 508:4 (1997).

---

[9] Dayutis alleges that defendants Michael Cunningham and John Eckert continued to retaliate against him while he was incarcerated in Connecticut because they allegedly refused to pursue his transfer from Connecticut to Massachusetts. Although this claim would come within the three-year statute of limitations, it is without merit and Defendants are entitled to summary judgment as to these allegations. Evidence submitted by Dayutis himself establishes that Cunningham and Eckert not only suggested a transfer to Massachusetts, but were also willing to pursue such a transfer. See Pl.'s Obj. to Defs.' Motion for Summary Judgment and attachments. Moreover, evidence submitted by Dayutis establishes that he, not the Defendants, refused the transfer from Connecticut to Massachusetts. See id.

Dayutis was transferred to Connecticut on June 1, 1993. He filed his original complaint on March 22, 1996, less than three years later. Thus, although Dayutis' amended complaint alleging retaliatory transfer was not filed until June 9, 1997, his claim may come within the three-year statute of limitations if it "relates back" to the date of the original complaint.[10]

Dayutis appears to argue that his amendment automatically relates back to the date of the original complaint by virtue of the magistrate judge's order granting leave to amend. Dayutis is incorrect. The fact that the magistrate judge granted Dayutis leave to amend his complaint is not dispositive of the statute of limitations issue. See Pessotti v. Eagle Mfg. Co., 946 F.2d 974, 978 (1st Cir. 1991)(district court must treat relation back and leave to amend as separate questions). Rather, I must apply Fed. R. Civ. P. 15(c)(3), which governs whether an amendment relates back to the date of the original complaint for statute of limitations purposes. See O'Loughlin v. National R.R. Passenger

_____

[10] Dayutis filed a motion to amend and an amended complaint with this Court on January 15, 1997. His motion was denied without prejudice and Dayutis was directed to file a new motion and amended complaint complying with Local Rule 15.1. See Dayutis v. Brodeur, CV-96-156-B (D.N.H. March 24, 1997)(Endorsed Order of Magistrate Judge James R. Muirhead). Even if his original motion filed on January 15 had been granted, it would still have fallen outside the three-year limitations period.

-15-

Corp., 928 F.2d 24, 26-27 (1st Cir. 1991); Fed. R. Civ. P. 15(c)(3). Rule 15 provides that an amendment which adds a new claim to the original complaint relates back when

> . . . (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . ..

Fed. R. Civ. P. 15(c).

Dayutis' original complaint, filed with this Court on March 22, 1996, alleges violations of his right to due process and equal protection. Count I alleges that the pre-July 1992 disciplinary policy allowed prison officials to hand down unwarranted sanctions against him, which impacted his custody status and, in turn, caused the Parole Board to deny his requests for parole. Count II alleges that the Parole Board improperly denied parole by applying rules and regulations which were not in effect when he was sentenced for his crime. Nowhere does Dayutis allege that his transfer to Connecticut was retaliatory in nature. Dayutis does not allege any facts in his original complaint regarding his litigation activities, which he now claims sparked the Defendants' decision to move him out of state. While he notes in the original complaint that he was unable to achieve a custody-level reduction to C-2 or C-1 status while in Connecticut, causing the Board to deny parole, he does not claim

-16-

that his transfer was in retaliation for the exercise of his First Amendment rights. Thus, I find that Count III of Dayutis' amended complaint does not relate back to his original pleading for statute of limitations purposes.

### 2. Dayutis' claim does not constitute a "continuing wrong" for statute of limitations purposes and, thus, accrued on the date of his transfer to Connecticut.

Dayutis also argues that his claim did not accrue until he was transferred from the Connecticut prison back to New Hampshire. This is so, he claims, because the Defendants' alleged violation constituted a "continuing wrong" from the date of his transfer out of state until it was remedied by his return to New Hampshire. Again, Dayutis is incorrect.

Although state law provides the applicable statute of limitations, federal law governs the question of when the limitations period begins to run. See Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 (1st Cir. 1995). A § 1983 claim accrues when the plaintiff "knows or has reason to know of the injury which is the basis of the action." See id. (quoting Street, 936 F.2d at 40). Here, Dayutis knew or had reason to know of his injury when he was transferred, allegedly against his will, to a Connecticut facility. That Dayutis continued to feel the effects of the transfer up until his eventual return to the

-17-

New Hampshire State Prison is of no import to the "continuing wrong" analysis. See Johnson v. Rodriquez, 943 F.2d 104, 108 (1st Cir. 1991); Gilbert v. City of Cambridge, 932 F.2d 51, 58-9 (1st Cir. 1991); see also Batiste v. City of Boston, 23 F.3d 394, 1994 WL 164568 at **2 (1st Cir. 1994)(unpublished disposition); Fisher v. United States, 959 F.2d 230, 1992 WL 63516 at **3 (1st Cir. 1992)(unpublished disposition). Dayutis "obfuscates . . . the critical distinction between a continuing act and a singular act that brings continuing consequences in its roiled wake." Gilbert, 932 F.2d at 58-9 (internal quotations omitted). A continuing wrong is characterized by continued unlawful acts, not by continued injuries "which are the natural, if bitter, fruit" of the original violation. Jensen v. Frank, 912 F.2d 517, 523 (1st Cir. 1990). In order to be actionable as a continuing violation, therefore, Dayutis must demonstrate at least one separate illegal act which transpired within the limitations period. See id. (citing Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 183 (1st Cir. 1989)). Dayutis has not done so. Thus, I find that Count III of Dayutis' complaint does not constitute a continuing wrong. As such, New Hampshire's three-year statute of limitations bars Dayutis from bringing Count III of his complaint.

## IV. <u>CONCLUSION</u>

For the above reasons, I grant defendants' motion for summary judgment (document no. 50) as to all counts and all defendants set forth in plaintiff's amended complaint (document no. 16).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

June 23, 1999

cc:  Dean Dayutis, pro se
     Suzanne M. Gorman, Esq.