United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 8, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-61017

_____

THOMAS EDWIN LODEN, JR.,

Plaintiff-Appellant,

versus

LEON HAYES, Sheriff; ITAWAMBA COUNTY SHERIFF'S
DEPARTMENT; KERMIT NEWELL, Jailor/Deputy; BRYAN JONES,
Investigator/Deputy; JOHN DOES 1-15, 8 John Does (Names Unknown)
Sheriff's Deputies; DAVID SHEFFIELD, Investigator; EARLIE
WEATHERSPOON, Deputy.

Defendants-Appellees.

_____

Appeal from the United States District Court for
the Northern District of Mississippi
(USDC No. 1:02-CV-00273)

_____

Before REAVLEY, STEWART, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Thomas Loden appeals from an order of the district court adopting the report and

recommendations of the magistrate judge and entering judgment for the defendants.

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion
should not be published and is not precedent except under the limited circumstances
set forth in 5TH CIR. R. 47.5.4.

Loden challenges the conditions of his confinement as a pre-trial detainee at the Itawamba County Jail. We affirm for the following reasons:

1.       Loden challenges the magistrate judge's refusal to appoint counsel for him. However, an indigent plaintiff is not automatically entitled to counsel in a civil rights case. *Branch v. Cole*, 686 F.2d 264 (5th Cir. 1982) (per curiam). In determining that he would not appoint counsel for Loden, the magistrate judge properly examined the four factors set forth in our precedent. Those factors include: "(1) the type and complexity of the case; (2) whether the indigent is capable of adequately presenting his case; (3) whether the indigent is in a position to investigate adequately the case; and (4) whether the evidence will consist in large part of conflicting testimony so as to require skill in the presentation of evidence and in cross examination." *Ulmer v. Chancellor*, 691 F.2d 209, 213 (5th Cir. 1982) (citations omitted). The magistrate judge determined that the issues were not extraordinarily complex, and that Loden appeared to be capable of presenting his case well. Loden argues that the case was indeed complex, involving claims of deliberate indifference to his medical needs, which he had to investigate himself while incarcerated. However, Loden acquitted himself admirably in investigating and presenting his case, and in cross-examining witnesses—he impeached defendants and even made hearsay objections—thus undermining his claim that he needed appointed counsel.

2.       Loden objects to the magistrate judge's decision not to appoint a medical

expert. Federal Rule of Evidence 706 allows the court to appoint an expert on its own motion or the motion of any party, but provides no other standard. FED. R. EVID. 706. The magistrate judge in the instant matter determined that Loden's case did not involve complicated scientific matters that were difficult for the court to understand: Loden claimed that the defendants did not remove his sutures and staples in a timely manner; and that they failed to respond to his requests for mental health treatment, which resulted in a third suicide attempt. Neither of these matters are of so complex a nature as to require an expert's testimony.

3.     Loden filed a motion requesting phone access before the hearing held on July 19, 2004. The magistrate judge was apparently unaware of the motion prior to the hearing, and afterwards dismissed the motion as moot. Two of Loden's witnesses did not appear at the evidentiary hearing. Loden argues that had he been able to access the phone, the witnesses would have come to the hearing.

However, Loden was not harmed by the fact that his witnesses did not testify at the hearing. Loden argues that one witness, Mack McElhenney, would have testified that jailers at Itawamba had asked for money in exchange for looking out for his son, prisoner Mark McElhenney. But no one questioned Loden's assertion that Deputy Weatherspoon borrowed money from Loden's mother, and Loden did not allege in his complaint or elsewhere (except in his reply brief to this Court) that it was a practice or policy for the jail to have its jailers request money from inmates' families.

3

As for Inez Manasse, the second missing witness, Loden told the magistrate judge that he did not know what Manasse's testimony would be. Loden mentions in his reply brief that Manasse's testimony would have had something to do with his allegation that he never received legal materials. However, no one denied that Loden never received legal materials while in Itawamba County Jail. Thus, Loden was not harmed by this witness's absence.

4.     Loden contends that he was only given thirty minutes to view videotape evidence. A review of the hearing transcript reveals that Loden only asked for thirty minutes to review the videotape. Loden's argument therefore fails.

5.     During the evidentiary hearing, Loden made certain claims that implicated the validity of his criminal conviction: specifically, he alleged that he was not permitted sufficient contact with his criminal attorney, and that he was not provided with legal materials to work on his criminal case. The magistrate judge's report recommended dismissal of these claims under *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364 (1994), and the district court accordingly dismissed them.

In *Heck*, the Supreme Court held that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 487, 114 S. Ct. at 2372. In this case,

4

although Loden argues that he is not challenging his conviction, his contentions, if true, would necessarily imply its invalidity. Thus, the district court properly dismissed all claims that implicated the validity of Loden's criminal conviction.

6. The magistrate judge's report correctly found that there was no obligation for county jails to educate prisoners regarding the Prison Litigation Reform Act or § 1983. The magistrate judge further found that if Loden had needed help, his family could have provided it for him. Loden objects to these findings.

In his petition, Loden alleged only that he sought legal materials to help with his criminal case and his divorce proceedings. Furthermore, Loden's questions and testimony during the hearing never suggested that he sought legal materials to bring a petition challenging the conditions of his confinement. Loden had no constitutional right to legal material to help with his divorce proceedings, and any claim that a lack of legal materials affected his criminal trial is not cognizable in this § 1983 proceeding under *Heck v. Humphrey*, *supra*. In his objections to the magistrate judge's report, Loden asserts for the first time that he sought legal materials at Itawamba for the purpose of bringing a § 1983 suit. Loden had two appointed criminal attorneys during most of his stay at the Itawamba County Jail, and according to Loden, an attorney brought at least one of Loden's claims to the attention of the judge in Loden's criminal trial. Thus, Loden had "meaningful access to the courts" through his attorneys. *See Lewis v. Casey*, 518 U.S. 343, 351, 116 S. Ct. 2174, 2180 (1996) ("[P]rison law libraries and legal assistance

5

programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."(internal quotations and citation omitted)).

7.      The magistrate judge found that Loden was not harmed by a lack of access to his paralegal during divorce proceedings.  There is no constitutional right to talk to a paralegal during divorce proceedings.

8.      The magistrate judge found that several of Loden's complaints, including the initial directive for jail personnel to avoid contact with Loden, the video surveillance, and Loden's lack of showers, exercise, and phone access, were related to the legitimate penological objective of security, both for Loden himself and for jail staff.  Loden objects that he was only provided with soap, a washcloth and a towel, and was not allowed footwear for a time.  Further, he argues that the magistrate judge did not consider that there was no laundry service at the jail for inmates (families performed that function).

"[T]he Constitution does not mandate comfortable prisons. . . ." *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981).  It is not clear that the above restrictions impinged on Loden's constitutional rights.  Even if they did, the restrictions were developed by a responsible administrator in response to threats to Loden and the jail staff, and bore a reasonable relation to the legitimate penological objective of safety and security.  *C.f. Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261–62 (1987).

Loden also asserts that his mail was read and that he had magazines taken away

6

from him. In mentioning magazines, Loden refers to a one-time incident when a state policeman confiscated a magazine from Loden. It appears from testimony that the named defendants gave magazines to Loden, and that Loden's family was allowed to bring him magazines and books. As for the mail, prison officials apparently suspected that Loden was involved in an escape attempt, and the decision to read Loden's letters was legitimately related to keeping him safely in jail.

The magistrate judge also determined that the flooding of Loden's cell did not rise to the level of a constitutional violation, and we agree. Loden's own testimony was that plumbing problems were usually fixed "promptly." Loden stated that at one point his sink was stopped up for a week, but in the meantime, one of the defendants tried to unstop it with Draino. Defendants appear to have done their best to deal quickly with plumbing issues, and any minor problems do not rise to the level of a constitutional violation.

9. Loden made claims that defendants were deliberately indifferent to his medical needs by (1) failing to administer medications properly; (2) failing to take him to the doctor in a timely manner when he needed to have sutures or staples removed; and most significantly, (3) ignoring his requests for psychological assistance, resulting in a suicide attempt. The magistrate judge found that there was no deliberate indifference on the defendants' part.

Under the Fourteenth Amendment's due process clause, pre-trial detainees may

7

demonstrate a violation of their constitutional rights by showing that officials exhibited "deliberate indifference" to a substantial risk of detainees' serious harm. *United States v. Gonzales*, 436 F.3d 560, 573 (5th Cir. 2006). Negligence is not sufficient to meet the deliberate indifference standard. *Estelle v. Gamble*, 429 U.S. 97, 106–07, 97 S. Ct. 285, 292 (1976). Deliberate indifference requires that the defendant be subjectively conscious of the risk to the plaintiff. *Farmer v. Brennan*, 511 U.S. 825, 840, 114 S. Ct. 1970, 1980 (1994).

First, Loden's claim that his medications were not dispensed properly does not rise to the level of a constitutional violation. There was testimony that the jail personnel attempted to give Loden every medication that was prescribed for him. At one point, a jailer went out and bought some sleeping pills for Loden when he ran out. There was no evidence presented that Loden suffered or risked suffering serious harm as a result of any mistakes. For example, Loden testified that when his Augmentin prescription was not filled, the wound briefly became "tender and sore," but Loden suffered no permanent harm. Therefore, Loden cannot prevail on his claim that the defendants were deliberately indifferent to his medical needs.

Second, Loden has not demonstrated that defendants exhibited deliberate indifference to his medical needs by delaying the removal of his sutures. Loden did not establish that any of the defendants knew that Loden needed his sutures, and later his staples, removed. In addition, defendant David Sheffield testified that Loden removed his

8

staples himself prior to the time when he was supposed to return to the doctor, in order to get attention. Finally, Loden failed to demonstrate that he suffered or risked suffering any substantial harm as a result of defendants' inaction.

Third, Loden argues that defendants were deliberately indifferent to his requests for mental health treatment.[1] There was no contention that defendants were ignorant of Loden's mental state when he arrived at Itawamba County Jail. Loden's mother requested psychological help for him and defendants apparently knew that he had attempted suicide twice before arriving. Loden testified that he also requested treatment. Nonetheless, Loden did not receive any mental health treatment, and managed to attempt suicide again.

Although defendants did not send Loden to a doctor for his mental problems, they did take some precautions to prevent a suicide attempt. Defendants installed a video camera in Loden's cell, so that he could be observed at all times, and they were careful to ensure that Loden had no razors. Furthermore, personnel were instructed to have conversations with Loden when he seemed "uptight." Thus, Defendants were not indifferent to the knowledge that Loden could hurt himself, nor did they knowingly subject him to a substantial risk of harm. Instead, they took measures to try and prevent Loden from attempting suicide. Therefore, Loden's claim that they were deliberately

---

[1]Loden has also claimed that defendants' failure to provide mental health treatment somehow prevented him from obtaining medical retirement from the Marines. Even if true, this allegation does not state a claim for a constitutional violation.

indifferent to his psychological state fails.[2]

10. The magistrate judge found that Deputy Earlie Weatherspoon's actions in obtaining a loan from Loden's mother was not a constitutional violation, but instead an example of extremely bad judgment. Loden disagrees, stating that he does not feel that the magistrate judge adequately took into account the effect the loan had on his family, and the fact that his mother did not feel she could refuse. Loden further notes that some of this money had been set aside for his daughter's Christmas present, and that the loan has never been repaid.

We agree with the magistrate judge that Weatherspoon's actions demonstrated poor judgment, but do not amount to a constitutional violation. Loden's mother was known in the community for loaning money to those in need. Weatherspoon provided collateral for the loan. Furthermore, Weatherspoon did not at any point threaten to do Loden harm, and thus the magistrate judge did not err in determining that Weatherspoon's actions did not rise to the level of a constitutional violation.

AFFIRMED.

---

[2]The magistrate judge also correctly found that any state law claims on these issues were barred by the Mississippi Tort Claims Act, Miss. Code Ann. § 11-46-9(1)(m).